F. W. WOOLWORTH CO., A CORPORATION OF THE STATE OF NEW YORK, APPELLANT-CROSS-RESPONDENT v. DIRECTOR OF DIVISION OF TAXATION OF THE DEPARTMENT OF THE TREASURY OF THE STATE OF NEW JERSEY, RESPONDENT-CROSS-APPELLANT.

Argued May 19, 1964—Decided August 16, 1965.

467

Mr. *William T. Pullman* of the New York bar argued the cause for appellant-cross-respondent (*Messrs. Minton, Dinsmore & Bohlinger*, attorneys; *Mr. B. Braddock Dinsmore, Jr.* and *Mr. Pullman*, of counsel).

Mr. *Alan B. Handler*, First Assistant Attorney General, argued the cause for respondent-cross-appellant (*Mr. Arthur J. Sills*, Attorney General of New Jersey, attorney; *Mr. Handler*, of counsel and on the brief).

The opinion of the court was delivered by

HALL, J. This case involves the tax liability of the appellant (herein Woolworth), a New York corporation authorized to do business in New Jersey, under this State's Corporation Business Tax Act, *N. J. S. A.* 54:10A–1 *et seq.*, for the privilege of exercising its franchise and doing business here in the year 1959.[1] The tax is in two portions, one measured by net worth and the other by net income.

Speaking as of the end of 1959, Woolworth is engaged in the retail, chain-store variety business through the ownership and operation of some 2000 stores under the Woolworth name all over the United States, Puerto Rico and Cuba. It does not engage in manufacturing or processing, confining its business to the purchase of merchandise at wholesale and resale directly to consumers. This enterprise is concededly operated in a unitary manner by this single corporate entity through its executive headquarters in New York. The operation of some 80 stores constitutes its entire New Jersey business activity. Woolworth also owns all or a majority of the stock of five foreign corporations ("the Canadian company," "the Mexican company," "the German companies," "the English company"), which in turn operate almost 1500 similar stores in the same fashion under the same familiar name in many other parts of the world.

The controversy before us arises from the respondent Director's inclusion of the net worth of and income to the parent from these foreign corporations in the New Jersey tax bases and the inclusion of the parent's receipts therefrom in the statutory formula for the allocation to this State of a portion of the entire net worth and net income of corporations also maintaining a regular place of business outside this State and from his refusal to make any adjustment with respect thereto

---

[1] The tax for the privilege year, although paid in the subsequent year, is determined by the statutorily significant elements as of the end of the privilege year, which thereby becomes the base year as well.

in the computation and application of the allocation formula under his statutory authority so to do.

Woolworth appealed to the Division of Tax Appeals from the Director's determination. It claimed that the foreign companies are managed and operated so separately and autonomously as not to make the aggregate of American and foreign business a valid unitary whole for tax base purposes in New Jersey and therefore asserted that the Director's inclusion violates the due process clause of the Federal Constitution because it amounts to taxation of extraterritorial values and activities. (The commerce clause is not asserted to be involved.) This contention rests on the application of the act to Woolworth's situation rather than on any alleged intrinsic unconstitutionality of any provision thereof. If such inclusion of the elements relating to the subsidiaries does not go so far as to amount to violation of due process, the taxpayer claimed abuse of discretion by the Director in refusing to make adjustments amounting either to exclusion thereof or to some lesser extent on the ground that otherwise the tax assessed is unfair and contrary to the legislative policy. The Division of Tax Appeals upheld the levy with respect to the net worth aspect on a finding that Woolworth's world-wide business was unitary for this purpose, but determined that New Jersey could not include in the income measure income by Woolworth from the foreign subsidiaries, because it was not reasonably attributable to this State. Since the Division conceived, in essence, that the statutory section permitting the Director to make adjustments was not intended to require application beyond conformity to constitutional limitations, it did not reach the claim that he had abused his discretion in refusing to do so. Both parties appealed to the Appellate Division and we certified the matter while it was pending there. R. R. 1 :10–1(a).[2]

---

[2] After oral argument of the appeal, we realized that the perplexing intricacies of the case required further elucidation. We felt that we could be better enlightened by a round-table discussion between court, counsel and any expert associates they might desire to have in attendance than by a formal reargument. Counsel agreeing, such a

Consideration of the questions posed will be aided by first setting forth a more detailed analysis of the act and of its concrete application here.

This annual levy imposed upon every nonexempt domestic and foreign corporation is an excise (privilege) impost rather than a property tax. *N. J. S. A.* 54:10A–2; *Werner Machine Co. v. Director of Division of Taxation,* 17 *N. J.* 121 (1954), affirmed 350 *U. S.* 492, 76 *S. Ct.* 534, 100 *L. Ed.* 634 (1956); *United States Steel Corp. v. Director, Division of Taxation,* 38 *N. J.* 533, 540 (1962). It is computed by adding together prescribed percentages of net worth and net income. *N. J. S. A.* 54:10A–5. Net worth was the only measure when the tax was originally imposed by *L.* 1945, *c.* 162, in lieu of all other state, county or local taxation upon or measured by intangible personal property used in business by corporations covered by the law and to replace the then existing capital stock franchise tax. *N. J. S. A.* 54:10A–2; *United States Steel Corp. v. Director, Division of Taxation, supra* (38 *N. J.,* at *pp.* 539–541). The income tax portion was added as simply another element of the 1945 franchise tax, to provide an increase in the State's revenues, by amendment made by *L.* 1958, *c.* 63, effective for the privilege year 1959. (New Jersey imposes no general direct personal or corporate tax measured by or levied upon income.)

Net worth is in essence the stockholders' book equity in the corporation (or fair value if the books do not disclose proper valuation), subject to some compulsory adjustments prior to allocation not pertinent. *N. J. S. A.* 54:10A–4(d). Net income is "deemed *prima facie* to be equal in amount to the

session was held in September 1964. Thereafter our decision was delayed by reason of the grant of *certiorari* by the United States Supreme Court on October 26, 1964 in *District of Columbia v. General Motors Corporation,* 118 *U. S. App. D. C.* 381, 336 *F. 2d* 885 (1964), the ultimate determination in which it was felt might have some bearing on the issues here presented. The United States Supreme Court decided that case on April 27, 1965. *General Motors Corporation v. District of Columbia,* 380 *U. S.* 553, 85 *S. Ct.* 1156, 14 *L. Ed. 2d* 68.

taxable income, before net operating loss deduction and special deductions, which the taxpayer is required to report to the United States Treasury Department for the purpose of computing its Federal income tax" with some specified variations, the important one here being the exclusion of 50% of dividends received by the taxpayer which were included for Federal income tax purposes. *N. J. S. A.* 54:10A–4(k).

■ Under the well settled thesis that the realistic value of the exercise of a franchise in a particular state by a corporation with business activities in more than one jurisdiction is ordinarily not adequately measured by the worth of its assets or income in that state alone, but is enhanced and contributed to by that of the entire enterprise, state franchise tax statutes built on this thesis must provide for a method of proportionate allocation of the totals everywhere to reflect that enhancement. That set forth in the New Jersey Act (denominated the "allocation factor," *N. J. S. A.* 54:10A–4(b)) with respect to the net worth measure is succinctly summarized in *United States Steel Corp. v. Director, Division of Taxation, supra:*

"With respect to multi-state activities, the statute prescribed two basic formulas for the allocation to this State of the portion of total net worth to be taxable here, the tax to be measured by the greater of the portions so allocated. Section 5(a) [N. J. S. A. 54:10A–5(a)] refers to section 6 [N. J. S. A. 54:10A–6] which employs the so-called Massachusetts formula, a composite of average value of real and tangible personal property, receipts, and payroll in New Jersey as against the totals therof everywhere. Section 5(b) [N. J. S. A. 54:10A–5(b)] utilizes the ratio of the average value of assets in New Jersey to assets everywhere." (38 *N. J.*, at *pp.* 541–542)

The three-part formula, referred to as the *business* allocation factor, prescribed by *N. J. S. A.* 54:10A–6, and not the single assets (tangible and intangible) formula, called the *assets* allocation factor, provided in *N. J. S. A.* 54:10A–5(b), produced the greater result here on the basis of the taxpayer's return and so was controlling. The business allocation factor requires the portion of the taxpayer's entire net worth allo-

cable to New Jersey to be computed by multiplying the entire net worth by the average of three fractions:

1. The value of the taxpayer's real and tangible personal property within the State over the value of all such property wherever situated.

2. The taxpayer's gross receipts from sales of tangible personal property, services performed, rentals from property and all other business receipts earned within the State over the total of such receipts whether within or without the State.

3. The total wages, salaries and other personal service compensation of officers and employees within the State over the total of such compensation within and without the State.

The allocated net worth figure thus produced is then multiplied by the two mill rate applying to net worth (*N. J. S. A.* 54:10A-5(b)) to obtain the amount of this portion of the tax.

The net income part of the tax is ascertained by the same process, *i.e.*, the entire net income of the corporation, less 50% of dividends received and other variations specified by *N. J. S. A.* 54:10A-4(k), is multiplied by the same business allocation factor to compute the net income allocated to New Jersey, *N. J. S. A.* 54:10A-6, and that figure is then multiplied by the 1¾% rate on income (*N. J. S. A.* 54:10A-5(c)) to fix the dollar *quantum* of that part of the tax. It is plain from *N. J. S. A.* 54:10A-5(c) that the asset allocation factor may not be used for the allocation of net income even if such use would produce a greater result.

The act further provides by *N. J. S. A.* 54:10A-8, as amended in 1958, that the Director may, in any case, adjust the business allocation factor, with respect to its application to either net worth or income or both (but not the asset allocation factor if that be controlling as to net worth in the particular instance), if it appears to him that the factor determined pursuant to *N. J. S. A.* 54:10A-6 "does not properly reflect the activity, business, receipts, capital, entire net worth or entire net income of a taxpayer reasonably attributable to the State * * * by

(a) excluding 1 or more of the factors therein;

(b) including 1 or more other factors, such as expenses, purchases, contract values (minus subcontract values);

(c) excluding 1 or more assets in computing entire net worth; or

(d) excluding 1 or more assets in computing an allocation percentage; or

(e) applying any other similar or different method calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State."

To make the controversy more concrete and understandable, brief reference should be made to the basic figures involved (stated approximately). According to Woolworth's return,[3] the total net worth of the domestic company and foreign subsidiaries and thus the net worth tax base, was $647,000,000, of which the domestic company accounts for $282,000,000 and the foreign subsidiaries $365,000,000 (based on the percentage of their stock owned by the parent at the value shown on the subsidiaries' books). The total net income was $51,000,000, $34,500,000 from domestic operations and $16,500,000 receipts, consisting of dividends and interest on moneys loaned or advanced, by the parent from the foreign companies. Since

---

[3] The Director's Regulations (1959), promulgated under the authority if *N. J. S. A.* 54:10A-27, require that the taxpayer's return be filed and the tax paid strictly in accordance with the statutory requirements and allocation formula. Any request for adjustment of the business allocation factor is to be made by rider to the return as so filed. Reg. 16:10–4.300. Woolworth's return therefore included the pertinent figures relating to the foreign subsidiaries, except that those concerning the Mexican and German companies were omitted. This was apparently an inadvertent error and it has been understood throughout that, unless this court held the foreign subsidiaries were to be completely excluded, the matter would have to be returned to the Director for correction and recomputation to give account to the Mexican and German figures. Consequently the figures used in this opinion, although spoken of generally as if all-inclusive, do not include those for the Mexican and German companies unless otherwise noted. Despite this fact, they are sufficiently illustrative of the points made.

only 50% of dividend income is includible in the income tax base under the New Jersey statute, that base was $34,500,000 plus $8,400,000 or a total of $42,900,000.

Computation of the allocation factors resulted in the following:

The assets allocation factor, N. J. S. A. 54:10A-5(b)—the ratio of the average value of assets in New Jersey to assets everywhere, tangible and intangible including the stock of the foreign subsidiaries—based on respective figures of $22,000,-000 to $790,000,000 was 2.793%.

The composite of the three elements making up the business allocation factor, N. J. S. A. 54:10A-6, produced this result:

As to the property element—the ratio of average value of the taxpayer's real and tangible personal property in New Jersey and everywhere—, the respective figures were a numerator of $15,500,000 and a denominator of $269,300,000, giving a percentage of 5.749%. Necessarily the denominator did not include anything relating to the foreign subsidiaries.

As to the receipts element—the ratio of sales and other business receipts within New Jersey and everywhere—the respective figures were a numerator of $38,900,000 and a denominator of $833,400,000, giving a percentage of 4.665%. The denominator included the $16,500,000 dividend and interest receipts by the parent from the foreign subsidiaries and represents the only place in the business allocation factor (except to a very slight degree in the payroll element) where the foreign subsidiaries were taken into account.

As to the payroll element—the ratio of total wages, salaries and other personal service compensation paid within New Jersey and everywhere—the respective figures were $7,700,000 and $182,500,000, giving a percentage of 4.234%.

Averaging the three percentages produced a business allocation factor of 4.884%. Since this was greater than the assets allocation factor of 2.793%, it was applied to the two tax bases, resulting in a tax of $63,000 on the net worth portion and of $37,000 on the income portion, or a total of $100,000.

Woolworth's complaint as to the unfairness of the allocation formula on a unitary approach, stated practically, may be summarized by this quotation from its brief:

"* * * the Taxpayer's business outside of New Jersey represented by its investments in the five foreign corporations is not reflected in the business allocation percentage determined pursuant to Section 6 except to the extent that there is included in the denominator of the receipts factor the sum of $16,617,719 * * * out of total receipts of $833,406,502, and it is not represented at all in the assets [real and tangible personal property] factor of $269,281,683 or in any significant degree in the payroll factor of $182,505,150 * * *; so that these vast foreign enterprises, representing almost half, in value and income, of the Company's total business, are given a weight of only 2/3 of 1% in formula (1/3 × 16,617,719 : 833,406,502), which is the equivalent of determining that almost 5% of the net worth and income of the Mexican, Canadian, English and German investments is attributable to the business privilege which the taxpayer enjoys in New Jersey."

If the foreign subsidiaries were to be excluded entirely, as to both the net worth and income tax bases and in the computation of the allocation factor, the result would be, according to Woolworth's request for adjustment annexed to the return, a tax on net worth of $36,000 (here the assets allocation factor would be used since it would produce the greater tax) and on income of $30, 000, or a total of $66,000.[4]

The issues involved are naturally divided into two principal categories—the question of the tax base and the question of allocation. Certain observations which bear on both questions may well be made prior to our discussion of each category in order to put the issues in as sharp a focus as possible.

Woolworth is a company which is engaged domestically, and through its foreign subsidiaries in other countries, in a

---

[4] This would have to be the result if Woolworth's contention that the foreign subsidiaries may not be constitutionally included were to be upheld. If there is no constitutional barrier to their inclusion in the tax base, it does not insist that complete omission as a matter of discretionary adjustment by the Director of the business allocation factor under N. J. S. A. 54:10A–8 is the only reasonable avenue open to him. Rather it urges before us that there are various other possible lesser reasonable and fair methods of adjustment which he validly may choose from in the exercise of administrative discretion.

single business—that of purchasing merchandise at wholesale and reselling it directly to consumers at retail through its own stores. It is not a case where a taxpayer is, in effect, conducting two distinct enterprises, one its principal endeavor of merchandising, manufacturing or what not, and the other, an essentially different business involving the investment of some of its assets in the securities of unrelated corporations. Here the intangibles owned by Woolworth are the capital stock of its own companies carrying on the same business in the same way under a common banner in other parts of the world. Nor is it a case where a taxpayer conducts successive aspects of a single business in different jurisdictions, as for example, mining in one, manufacturing or processing in another and warehousing and selling the finished product in still others. And it is not a situation where a taxpayer is engaged in diversified activities in many lines of business involving distinct products, services and functions, separately conducted by divisions of a single corporation or through subsidiaries, in varying jurisdictions. Woolworth's business in its New Jersey stores is the same as that conducted in those in New York, California, Canada or the British Isles. We make these distinctions in order to emphasize the relatively narrow and unique corporate business pattern with which we are to deal in order that what we say may be understood, except when we speak generally, as being directed to the precise situation before us.

## I.

### The Tax Base Question

Here we deal with the constitutional question of the right of New Jersey to compel the inclusion in Woolworth's net worth and net income for franchise tax base purposes of the value of the stock of its foreign subsidiaries and its receipts therefrom during the base year. As has been indicated, Woolworth claims such inclusion violates the due process clause. The Division held it did not insofar as net worth was con-

cerned because the entire enterprise was unitary, but that the receipts from the subsidiaries could not "reasonably be attributed to [Woolworth's] business in New Jersey" and so had to be excluded from the tax base. The Division treated the income feature primarily as a matter of statutory construction, although it said that such inclusion also certainly appeared to violate the due process clause.

■■ As far as our statute goes, it seems clear enough, by reason of the definition of "net worth," *N. J. S. A.* 54:10A–4(d), and of "entire net income," *N. J. S. A.* 54:10A–4(k), that the value of intangible assets and the receipts therefrom are required to be included for tax base purposes, and that this aspect of the case may not be disposed of on any basis of statutory construction. *Cf. General Motors Corporation v. District of Columbia,* 380 *U. S.* 553, 85 *S. Ct.* 1156, 14 *L. Ed.* 2*d* 68 (1965). In this connection we ought to note that New Jersey is one of the few states that makes no provision by statute or administrative action in the case of foreign corporations doing business in the State for the direct allocation of intangible assets and certain types of income such as capital gains, rents, royalties, dividends and interest to the "headquarters" state of the corporation or for separate accounting for the business conducted within the State where the taxpayer can show that that business is truly separate and distinct from its business without the State and that such accounting more clearly reflects the income attributable to the State than does the formula. *Hellerstein, State and Local Taxation* 314 (1961); *Ratliff, Interstate Apportionment of Business Income for State Income Tax Purposes,* 31, 84–85 (1962). While the absence of such provisions in New Jersey does not in our opinion suggest a constitutional defect (no such question is raised here), and indeed they would have little if any pertinency here where the intangibles relate directly to Woolworth's entire business of a single type rather than to a separate investment enterprise and the in-state business is not different from that conducted outside it, we do think that our adjustment-of-allocation-factor section, *N. J.*

*S. A.* 54:10A–8, is thereby rendered of greater importance to assure fairness.[5]

 The right of a state constitutionally to include in the base for franchise tax purposes something more than the worth of the assets or income of a multi-state corporation from business within that state alone rests, as we said at the outset of this opinion, on the thoroughly accepted proposition, which Woolworth does not question, that the realistic value of the exercise of a franchise in a particular state is enhanced and contributed to by the worth or income of the entire enterprise everywhere, subject to a fair formula to apportion an appropriate share of the whole to the taxing jurisdiction. *Wallace v. Hines,* 253 *U. S.* 66, 69–70, 40 *S. Ct.* 435, 64 *L. Ed.* 782, 786 (1920) ; *Great Atlantic & Pacific Tea Co. v. Grosjean,* 301 *U. S.* 412, 424–425, 57 *S. Ct.* 772, 81 *L. Ed.* 1193, 1200 (1937) ; *Ford Motor Co. v. Beauchamp,* 308 *U. S.* 331, 336, 60 *S. Ct.* 273, 84 *L. Ed.* 304, 306–307 (1939) ; *Butler Bros. v. McColgan,* 315 *U. S.* 501, 508, 62 *S. Ct.* 701, 86 *L. Ed.* 991, 996 (1942). To validly apply such a tax base concept, there must be, however, a unity of use and management of the entire business. *Butler Bros. v. McColgan, supra.* This has led to the short-hand expression that the enterprise sought to be so taxed by a state must be "unitary." See *Household Finance Corporation v. Director of Division of Taxation,* 36 *N. J.* 353, 358 (1962), appeal dismissed, *cert.* den. 371 *U. S.* 13, 83 *S. Ct.* 41, 9 *L. Ed. 2d* 49 (1962).

---

[5] It should also be pointed out that our act does provide for different franchise tax treatment of investment companies at least 90% of the business of which consists of holding, investing, and reinvesting in securities, *N. J. S. A.* 54:10A–4(f) and (g) and 54:10A–5(d), and that we have a separate tax act for financial businesses which are in substantial competition with national banks. *N. J. S. A.* 54:10B–1 *et seq.* See *Household Finance Corporation v. Director of Division of Taxation,* 36 *N. J.* 353 (1962), appeal dismissed, *cert.* den. 371 *U. S.* 13, 83 *S. Ct.* 41, 9 *L. Ed. 2d* 49 (1962).

Note should also be taken of the fact that our Corporation Business Tax Act does not permit deduction from a taxpayer's net worth of the value of its holdings of a subsidiary unless the subsidiary is also taxable under the act. See *N. J. S. A.* 54:10A–9, Regs. 16:10–3.180.

■ While Woolworth concedes that its American business is unitary because the functional unity involved transcends state lines, it claims that the foreign subsidiaries operate independently and autonomously so that there is no such functional relationship and "unity of use" between them and the American business. Woolworth correctly recognized that it had the burden of establishing the proposition before the Division, which held that it had not been sustained insofar as the inclusion of the net worth of the foreign subsidiaries was concerned. The Division found that:

"* * * [T]he facts in this case * * * clearly indicate that [Woolworth] is not operating several independent, self-sustaining and self-operating businesses solely related by the unity of ownership. On the contrary there is a unity of use and a functional relationship existing throughout [its] entire worldwide business which in a plain and fairly intelligible way bears on the value and earnings of the business wherever it is operated."

The objective facts are admittedly not in dispute and Woolworth does not take issue with the Division's statement of them. Its quarrel is with the quoted findings of ultimate fact and conclusions of law. Our review convinces us that the Division's findings are justified and should not be disturbed, and that the legal result flowing therefrom is sound and valid. We will summarize the salient features as succinctly as possible.

First, mention should be made of the method of operation of the 2000 American stores by the parent company. The entire area is divided into 10 geographical districts, each of which is managed by a district manager responsible for the operation of the stores in his district who reports to the company's executive committee and president. There is centralized purchasing, accounting, advertising and financing furnished for all districts by the executive headquarters in New York City and it is unquestioned that uniform management and operations policies are administered for all stores.

Turning to the foreign subsidiaries, the Canadian and Mexican companies are organized and operated along sub-

stantially similar lines. Woolworth owns 100% of the stock of both and thus can exercise complete control. As sole voting stockholder, it elects all the directors of both companies.

The Canadian company is a large operation with 228 stores. Woolworth acquired it in 1912 by the issuance of stock. All its directors are also directors of Woolworth and 11 of the latter's officers are officers of the Canadian company, performing comparable services for each. The managing director of the Canadian company, primarily in charge of its business, is also an officer of the parent and a director of both companies. He is the only Canadian officer who receives any salary from that company, which pays Woolworth 3% of the latter's executive office expense as compensation for executive services furnished it. The compensation paid Woolworth's executive officers is based on Canadian profits as well as its own. The Canadian board of directors always meets in Woolworth's New York office. The parent's executive committee decides upon the opening and closing of Canadian stores and its construction department supervises store erection in that country. There is a full, complete and constant exchange of information on all phases of the business operations of the two companies.

Woolworth has always held out the Canadian company as an integral part of itself. Its financial statement has been consolidated with that of the parent for a long time. A statement in Woolworth's annual report for 1960 (the testimony was that the management and control situation as to all subsidiaries was the same in 1959) is typical of the parent's conception of the Canadian company:

"Woolworth's in Canada is an integral part of F. W. Woolworth Co. Always it has received the support and benefit of the total resources of the parent company. Prior to this year, in fact, operations in Canada have been reported as a District rather than as a subsidiary."

Although the Canadian company did not participate in the parent company's centralized purchasing, accounting, adver-

tising and financing, the Division concluded that "there is a complete unity of operation between the companies." At this point it should be noted that Woolworth follows a basic policy that goods sold in its stores and those of its foreign subsidiaries shall be produced and purchased in the country in which the store is located, insofar as such is at all possible.

The Mexican company commenced operations in 1956 and operates only seven stores. Woolworth nominates all its directors. Three of the eight are also directors of Woolworth. The principal officers of each corporation are the same. The active management of the Mexican company is in a general manager whose duties and functions are similar to those of a district manager in the United States operation except that he has the added responsibility of supervising purchasing, advertising and financing, which, however, follow the general policies of the parent company. Separate books of account are kept in Mexico. The operation there is handled as if it were part of Woolworth's Manhattan District. As in the case of Canada, the parent's board of directors determines when and where new stores will be opened and there is a full exchange of information between the two companies. The compensation of the general manager and two other Mexican officers is determined on the basis of Woolworth's profits and the earnings of the Mexican company are included in computing the percentage compensation of some of Woolworth's employees. The Mexican company was consolidated with the parent in the latter's financial reports commencing with 1960. On all these facts, the Division determined that there is no significant difference in the operation of the Mexican stores from those in the United States and that the Mexican operation is part and parcel of Woolworth's unitary operation.

The German operation consists of two companies. One is a corporation which operates the 91 stores in that country; the other a real estate holding company the sole business of which is to hold real estate which it rents exclusively to the operating concern for store purposes. Woolworth owns 97% of the stock of the operating company and 60% of the stock

of the holding company. The remaining 40% of the latter is owned by the operating company. Apparently by reason of German tax laws, dividends declared by the German companies are loaned back by Woolworth, evidenced by notes, and retained by those subsidiaries.

None of Woolworth's officers or directors are officers or directors of the German companies, but the latter are chosen by the managing director's submitting a slate to Woolworth's president on the basis of which Woolworth issues its proxy for their election. Dividends are declared only after consultation between the managing director and Woolworth's president. It is clear that the day-to-day relationship of the parent to the German companies is less close than in the case of the Canadian and Mexican companies. There apparently is no identity of officers or directors. (Woolworth does use the German company to a rather slight extent in making some purchases in that country for its American stores.) Full management of the German operation is vested in its managing director, who operates without detailed instructions from Woolworth's board of directors, but through reciprocal annual visits of top officers of the American and German companies for exchange of ideas and discussion of the German operation, a fairly complete exchange of information and policy is carried on. The Division opinion writer made this observation in the light of the essentially negative and stereotyped testimony, which is applicable as well to the English company:

"I am obliged to state, however, that [Woolworth's] witness in testifying concerning the amount of exchange of information, etc. appeared to do so reluctantly and guardedly and I became impressed with the idea that a closer relationship between management of [Woolworth] and management of W-Germany existed than was admitted."

As of 1960, Woolworth's financial statement, as in the case of the Canadian and Mexican companies, consolidates the German companies. The annual report for that year states that this change was made by reason of "[t]he growing importance

of our subsidiary companies." When this course was decided upon, Woolworth sent one of its officers and a representative of its auditing firm to Germany to direct the necessary changes in accounting methods to accomplish the consolidation.

Woolworth owns 52.7% of the capital stock of the English company, which operates 1035 stores under the Woolworth name in the British Isles and, through wholly owned subsidiary corporations, in the British West Indies and Southern Rhodesia. The remainder of the stock is widely held by British investors. The relationship with the parent is similar to that of the German companies. Here, however, three of the 15 English directors are also directors of Woolworth, including the latter's president and executive vice-president. The chairman of the English board of directors is also a Woolworth director. There is an obvious understanding on this score. Woolworth's president is consulted at times prior to the declaration of dividends. There are also officer visits back and forth and exchange of information. As in the case of Germany, the English company does some slight purchasing of goods for the American stores. The English company was not consolidated in Woolworth's 1960 statement, it is said, because of the large minority stock interest held publicly, but, according to Woolworth's annual report for that year, "* * * all of your company's equity in the British Company's earnings, rather than only the dividends received, has been taken up in income. In addition, the carrying value of our investment has been increased to an amount equivalent to our large equity in this subsidiary's net assets."

It is difficult to believe, as to the German and English companies as well as with the Canadian and Mexican companies, but that there is essential basic control and supervision of all by the parent, though not on a day-to-day, minute basis, under well understood policies and methods of conducting the same type of business in the same way under the same name throughout the world. Woolworth's annual reports in their narrative clearly indicate this to be so. Indeed, it seems Woolworth would not be carrying out its obligation to its own

stockholders if it were not true. The Division therefore concluded that Woolworth "* * * is engaged in the single business of operating, wherever they may be located, Woolworth's retail stores * * *"

Woolworth expresses its due process contention this way: while

"* * * its American business is a unitary business because the functional unity involved in centralized purchasing, accounting, financing and advertising produced admitted advantages which transcend state lines, the value of the Taxpayer's New Jersey franchise being enhanced by the over-all economies and other benefits directly resulting therefrom, * * * no such benefits redounded to the New Jersey stores as part of the American business operated by the parent company from anything that was done in Mexico, Canada, England and Germany, because the functional integration of their operations was substantially non-existent. Control, or the potentiality of control, always exists between parent and subsidiary but the relationships which make a controlled business part of the unitary business were lacking in any appreciable degree in the case of the Mexican and Canadian companies and were wholly lacking in the case of the English and German companies."

■■ We think, as did the Division, that this point of view is too narrow and that, factually, the value of the New Jersey privilege is sufficiently enhanced by the total value of the net worth of the entire enterprise to justify inclusion of the foreign subsidiaries in the tax base. Minute centralized control in the activities mentioned should not be the sole determinant. Having in mind the finding of the Division that sufficient unity of management was in fact present, of great significance also is the financial strength and power which the net worth of the foreign companies adds to the American operations. More than half of Woolworth's total net worth shown on its consolidated balance sheet represents the foreign assets. About a third of its net income came from that same source. It necessarily borrows money for current operations and improvements, which is done on the strength of its capital and earnings position. It can certainly borrow more money on more favorable terms by reason of the inclu-

sion of those items. The income from the foreign subsidiaries improves its working capital status (as well as making available more earnings for payment of dividends to its stockholders). Its consequently larger size and financial strength undoubtedly gives it a stronger competitive position in the United States in purchasing, advertising, retail prices, store equipment, training of employees and public projection of the Woolworth image in many ways which cannot help but have an effect—realistically as well as abstractly—on the over-all business of its New Jersey stores.

The question then becomes whether this total picture is legally adequate to meet due process requirements of sufficient relationship of the thing taxed to the taxing authority insofar as inclusion in the tax base is concerned (without regard at this point to the matter of appropriateness of the allocation formula and its application). From the standpoint of judicial precedent, the case may be thought of as having unique characteristics.

We think it ought to make no essential difference that the subsidiaries involved are located in foreign countries. See *Bass, Ratcliff & Gretton v. State Tax Commission*, 266 *U. S.* 271, 45 *S. Ct.* 82, 69 *L. Ed.* 282, (1924), where the English manufacturing end of an ale business and the New York sales end of the same business were found to be unitary for purposes of the New York franchise tax on a British corporation based on a percentage of total net income apportioned on the ratio of assets within the state to those everywhere. Nor is it of significance that the included items relate to subsidiary corporations constituting separate entities. See *National Leather Co. v. Commonwealth of Massachusetts*, 277 *U. S.* 413, 48 *S. Ct.* 534, 72 *L. Ed.* 935 (1928).

Woolworth points to United States Supreme Court decisions, particularly *Butler Bros. v. McColgan, supra*, 315 *U. S.* 501, 62 *S. Ct.* 701, 86 *L. Ed.* 991, where stress has been laid on the presence of centralized purchasing, accounting, advertising and the like as making unitary a business which is otherwise operated in autonomous units. That case involved a

California corporation franchise tax measured by net income apportioned in accordance with the three part Massachusetts formula. Butler Bros., an Illinois corporation, was engaged in the wholesale general merchandising business which it conducted through seven distributing houses or branches, one of which was located in California. Each house—in reality a division of the company—served a separate territory, maintained its own stock of goods, had its own sales force which handled all its sales, conducted its own credit and collection arrangements and kept its own books of account. The company maintained at its home office a central advertising division and a central purchasing division through which goods for resale by all of its houses were ordered. It was clear that central purchasing resulted in more favorable prices than if purchases were made separately by and for the needs of each branch. The company sought to show, by separate accounting of the business of its California branch, that it sustained a loss in that house's operations for the year and so should not be subject to the California tax, although overall its business produced a substantial profit. The court refused to permit separate accounting and sustained the levy based on the apportionment formula, concluding that, under the facts, there was "unity of ownership and management" and "functionally the various branches are closely integrated" by reason of the central purchasing division and the savings affected thereby. (315 *U. S.*, at *p.* 508, 62 *S. Ct.*, at *p.* 705, 86 *L. Ed.*, at *pp.* 996–997). The point is that there the court did not have to consider any other unifying factors because of the determinative obviousness of the situation. We know of no United States Supreme Court case holding or even intimating that such close functional integration is a *sine qua non* for a finding of a unitary enterprise for franchise tax purposes.

Indeed, in other cases, the court has relied upon the over-all size and financial power of the corporation as vital considerations entering into the value of the exercise of the franchise within the taxing state. For example, in *Great Atlantic & Pacific Tea Company v. Grosjean, supra,* 301 *U. S.*

412, 57 *S. Ct.* 772, 81 *L. Ed.* 1193, it upheld a Louisiana chain store license tax under which the rate of taxation per store in that state increased as the number of stores owned by the taxpayer *wherever located* increased. Mr. Justice Roberts said:

"The appellants contend the act deprives them of property without due process of law because the tax is imposed, at least in part, upon things which are beyond the jurisdiction of Louisiana. The state may not tax real property or tangible personal property lying outside her borders; nor may she lay an excise or privilege tax upon the exercise or enjoyment of a right or privilege in another state derived from the laws of that state and therein exercised and enjoyed. But, as we have seen, the subject of the tax in question is the prosecution of a defined business activity within the State of Louisiana—the conduct of a retail store which is a part of a chain under a single management, ownership or control—a legitimate subject of a license or occupation tax. The measure of the exaction is the number of units of the chain within the state—a measure sanctioned by our decisions. The rate of tax for each such unit is fixed by reference to the size of the entire chain. In legal contemplation the state does not lay a tax upon property lying beyond her borders nor does she tax any privilege exercised and enjoyed by the taxpayer in other states. The law rates the privilege enjoyed in Louisiana *according to the nature* and extent of that privilege in the light of the advantages, the capacity, and the competitive ability of the chain's stores in Louisiana considered not by themselves, as if they constituted the whole organization, but in their setting as integral parts of a much larger organization. We cannot hold that this privilege is unaffected by the status of the Louisiana stores as members of such a chain or that recognition of the advantages and capacities enjoyed by them as a result of that membership is forbidden in classifying them for progressive increase of rate. Such classification is not in legal effect the taxation of property or privileges possessed or enjoyed by the taxpayer beyond the borders of the state." (301 *U. S.*, at *p.* 424, 57 *S. Ct.*, at *p.* 776, 81 *L. Ed.*, at *p.* 1200)

And in *Ford Motor Co. v. Beauchamp, supra,* 308 *U. S.* 331, 60 *S. Ct.* 273, 84 *L. Ed.* 304, the court sustained a Texas franchise tax imposed upon a foreign corporation doing business in that state measured by a graduated charge upon such proportions of the corporation's net worth as the gross receipts of its Texas business bore to its total gross receipts, saying:

"In a unitary enterprise, property outside the state, when correlated in use with property within the state, necessarily affects the worth of the privilege within the state. Financial power inherent in the possession of assets may be applied, with flexibility, at whatever point within or without the state the managers of the business may determine. For this reason it is held that an entrance fee may be properly measured by capital wherever located. The weight, in determining the value of the intrastate privilege, given the property beyond the state boundaries is but a recognition of the very real effect its existence has upon the value of the privilege granted within the taxing state. This was recognized by this Court in Great Atlantic & Pacific Tea Company v. Grosjean * * *." (308 *U. S.*, at *p.* 336, 60 *S. Ct.*, at *p.* 276, 84 *L. Ed.*, at *pp.* 306–309)

■ We think the rationale of these cases points to the constitutional validity of the conclusion that, on the complex of facts as found by the Division, Woolworth and its foreign subsidiaries constitute a unitary enterprise warranting New Jersey's inclusion of the total net worth in the tax base.

Some comment should be made about decisions of various state courts, since both parties refer to them, dealing with the unitary business problem where the taxpayer is engaged in varying enterprises or aspects of an enterprise within or without the state. Many of these cases turn on peculiar facts or the provisions of the particular taxing statute or its administrative application and involve not only the validity of the tax base but also the allocation factor and its effect in the circumstances. Comparison is difficult and frequently not enlightening. A review indicates that they go both ways on the basic problems confronting us. Of course, none are binding precedents here.

The line of state court authority upon which Woolworth relies is exemplified by *Marshall-Wells Co. v. Commissioner of Taxation*, 220 *Minn.* 458, 20 *N. W. 2d* 92 (*Sup. Ct.* 1945). There a New Jersey corporation conducting an extensive wholesale hardware business with its headquarters and "commercial domicile" in Minnesota, concededly unitary, also had a subsidiary corporation operating a similar business in Canada. The question was whether dividends the taxpayer

received on the stock of the subsidiary were includible in its taxable income for Minnesota income and franchise tax purposes. The court held that they were not, finding that the businesses were not unitary, but distinct. See also with perhaps similar rationale, *Skelly Oil Co. v. Commissioner of Taxation*, 269 *Minn*. 351, 131 *N. W. 2d* 632 (*Sup. Ct.* 1964) ; *Commonwealth v. Columbia Gas & Electric Co.*, 336 *Pa*. 209, 8 *A. 2d* 404, 131 *A. L. R.* 927 (*Sup. Ct.* 1939) (but *cf.* Com-*monwealth v. Ford Motor Co.*, 350 *Pa*. 236, 38 *A. 2d* 329 (*Sup. Ct.* 1944), appeal dismissed 324 *U. S.* 827, 65 *S. Ct.* 857, 89 *L. Ed.* 1394 (1944), and *Commonwealth v. Northern Metal Co.*, 416 *Pa*. 75, 204 *A. 2d* 467 (*Sup. Ct.* 1964), *cert.* den. 380 *U. S.* 944, 85 *S. Ct.* 1026, 13 *L. Ed. 2d* 963 (1965)) ; *People ex rel. Sheraton Buildings, Inc. v. Tax Commission*, 13 *N. Y. 2d* 802, 242 *N. Y. S. 2d* 226, 192 *N. E. 2d* 180 (*Ct. App.* 1963), affirming 15 *A. D. 2d* 142, 222 *N. Y. S. 2d* 192 (*App. Div.* 1961) ; *American Bakeries Co. v. Johnson*, 259 *N. C.* 419, 131 *S. E. 2d* 1 (*Sup. Ct.* 1963).

The leading case reaching the opposite conclusion, to which the Director refers and which we feel represents the better view, is *Cleveland Cliffs Iron Co. v. Michigan Corporation and Securities Commission*, 351 *Mich*. 652, 88 *N. W. 2d* 564 (*Sup. Ct.* 1958). The taxpayer was an Ohio corporation, with its headquarters in that state. Its basic business was the operation of a large integrated iron production complex, a good part of which was carried on in Michigan. It also held controlling or partial interest in and operated several other corporations engaged in diverse businesses and owned stocks in unrelated steel companies to the extent of 27% of its total assets. The primary question was the includibility of the value of those steel stocks in its net worth for franchise taxation purposes in Michigan under a statute similar to our business corporation tax act. The court upheld their inclusion, among other reasons, on the basis that the taxpayer's entire enterprise was unitary and that a net worth base incorporating all of its assets apportioned on the three-part formula was an appropriate method of ascertaining the tax it should pay

for the exercise of its corporate franchise in Michigan.[6] See
also, with probably the same general approach, *In re Morton
Salt Co.*, 150 *Kan.* 650, 95 *P. 2d* 335 (*Sup. Ct.* 1939);
*Edison California Stores v. McColgan*, 176 *P. 2d* 697 (*Sup.
Ct.* 1947), on rehearing 30 *Cal. 2d* 472, 183 *P. 2d* 16 (*Sup.
Ct.* 1947); *Gulf Oil Corp. v. Morrison*, 120 *Vt.* 324, 141 *A.
2d* 671 (*Sup. Ct.* 1958).

To turn to the other aspect of the tax base question—the
inclusion in the net income portion thereof of receipts by
Woolworth from the foreign companies—we are in disagree-
ment with the Division's determination that such must be
excluded. We fail to see any meaningful distinction in the
present context between net worth and net income and are
convinced the Director is correct in so asserting on his cross-
appeal.

The Division viewed this feature of the tax as in essence a
direct tax on income as such and felt that, since the income
from the foreign subsidiaries would not be affected in any
degree if all Woolworth's stores in New Jersey were closed, it
could not be said that the foreign subsidiary income was
reasonably attributable to Woolworth's business in New Jersey.
While the Director suggests that less stringent
considerations may apply where the tax is for the privilege of
exercising a franchise where income is only a measure than
where the impost is directly on income, we will consider the
question as if there be no distinction between the two types of
levy. It is well settled that "the entire net income of a
corporation, generated by interstate as well as intrastate ac-
tivities" may be directly taxed by a state so long as it is
"fairly apportioned among the States for tax purposes by

---

6 It may be noted that the Michigan Corporation Tax Appeal Board
sustained the inclusion of Woolworth's investment in its foreign sub-
sidiaries for Michigan franchise tax purposes. *In the Matter of the
Appeal of F. W. Woolworth Co.*, 2 CCH Mich. Tax Reports, Par.
200–030 (1954). Since this was not a judicial determination, we do
not consider it of any appreciable bearing here. Woolworth also in-
forms us that these intangibles have been excluded from tax computa-
tions in other states for one reason or another.

formulas utilizing in-state aspects of interstate affairs," and this is so even where a corporation is engaged exclusively in interstate commerce. *Northwestern States Portland Cement Co. v. State of Minnesota*, 358 *U. S.* 450, 460, 3 *L. Ed. 2d* 421, 428, 79 *S. Ct.* 357 (1959). It should make no difference that the foreign subsidiary income sought to be included in the tax base would not be affected if the in-state business were discontinued, for Woolworth's total income picture would be changed. An analogous argument was made and rejected in *Butler Bros. v. McColgan, supra*, 315 *U. S.*, at *p.* 509, 62 *S. Ct.*, at *p.* 705, 86 *L. Ed.*, at *p.* 997.

The Division's reliance on the concept that this income cannot reasonably be attributable to this State we believe is misplaced. That concept derives from the language of the adjustment-of-allocation-factor section of our statute, *N. J. S. A.* 54:10A–8, authorizing adjustment of the allocation factor by the Director where, when computed in accordance with the statute, it "does not properly reflect the * * * entire net worth or entire net income of a taxpayer reasonably attributable to the State * * *." While reasonable attribution of the thing taxed to the taxing jurisdiction is the essence of the constitutional power to tax, that connection is found, as far as the tax base here is concerned, in the finding of the unitary nature of Woolworth's entire business. If the enterprise is unitary so as to permit the inclusion of the value of the foreign subsidiaries in net worth, the same valid basis exists to include the parent's receipts therefrom in net income.

We conclude that the Division was correct in including the value of the foreign companies in the net worth tax base, but erred in excluding Woolworth's receipts from these subsidiaries from the income tax base.

## II.

### *The Allocation Question*

This question assumes, as we have held, that the net worth of and net income from the foreign subsidiaries is properly

includible in the tax base. Woolworth's point is that an adjustment of the allocation formula under *N. J. S. A.* 54:10A–8 is required "because the factors in the formula do not *fairly* reflect all the activities which constitute such unitary business," particularly in that the business allocation factor does not "give fair recognition to these foreign holdings in the denominator of the fraction." The contention has two facets, one, that the result is so palpably unfair as to offend constitutional limitations,[7] and two, even if that not be true, discretionary adjustment by the Director under the cited statutory section is called for.

 It is, of course, elementary that, in order for a state to impose a franchise tax upon a corporation engaged in multi-state business, the tax base must be apportioned or allocated to the taxing state on a reasonable basis so that extraterritorial values will not be taxed. *International Harvester Co. v. Evatt*, 329 *U. S.* 416, 67 *S. Ct.* 444, 91 *L. Ed.* 390 (1947). While an apportionment formula fair on its face may nonetheless be invalid in its particular application, the United States Supreme Court "has long realized the practical impossibility of a state's achieving a perfect apportionment of expansive, complex business activities * * * and has declared that 'rough approximation rather than precision' is sufficient." *International Harvester Co. v. Evatt, supra,* 329 *U. S.*, at *p.* 422, 67 *S. Ct.*, at *p.* 447, 91 *L. Ed.*, at *p.* 395. To be of constitutional dimensions, the misapportionment must be palpable and the burden is on the taxpayer to satisfy that exacting test. *Underwood Typewriter Co. v. Chamberlain*, 254 *U. S.* 113, 41 *S. Ct.* 45, 65 *L. Ed.* 165 (1920) ; *Bass, Ratcliff & Gretton v. State Tax Commission, supra,* 266 *U. S.* 271, 45 *S. Ct.* 82, 69 *L. Ed.* 282 ; *Hans Rees' Sons v. State of North Carolina ex rel. Maxwell*, 283 *U. S.* 123, 51 *S. Ct.* 385, 75

---

[7] This thesis does not require that the taxing statute contain a provision authorizing adjustment. *Household Finance Corp. v. Director of Division of Taxation, supra* (36 *N. J.* 353). The financial business tax law there involved, *N. J. S. A.* 54:10B–1 *et seq.*, contains no section comparable to *N. J. S. A.* 54:10A–8.

L. Ed. 879 (1931). See *General Motors Corporation v. District of Columbia*, 380 *U. S.* 553, 85 *S. Ct.* 1156, 14 *L. Ed. 2d* 68 (1965); *Household Finance Corp. v. Director of Division of Taxation, supra* (36 *N. J.* 353); *United States Steel Corp. v. Director, Division of Taxation*, 38 *N. J.* 533 (1962).

 There can be no doubt, and Woolworth concedes it, that a three factor allocation formula utilizing real and tangible personal property, sales and payroll, representing the main elements which lead to the profits of a corporate enterprise, is a reasonable and practical one and that the average of the three is ordinarily a fair measure of the proportion of corporate activity within a particular jurisdiction, even though it does not fit perfectly in every situation. Two-thirds of the states levying this type of tax employ it, or variations of it, by statutory prescription or through administrative regulation or the exercise of administrative discretion. (It is peculiarly appropriate for a retail merchandising business.) See *General Motors Corporation v. District of Columbia, supra*, 380 *U. S.*, at *p.* 557, 85 *S. Ct.*, at *p.* 1159, 14 *L. Ed. 2d*, at *pp.* 72–73.

We are not convinced that its use without adjustment results in a palpable misapportionment and so becomes *unconstitutional* because a substantial proportion of a taxpayer's assets are intangibles or when the result is as in the instant case. The result here, while having elements of some unfairness, nowhere near reaches the dimensions which it did in *Hans Rees'*, 283 *U. S.* 123, 51 *S. Ct.* 385, 75 *L. Ed.* 879, the only case in recent years in which the United States Supreme Court has found the application of an apportionment formula to be unconstitutional.[8] There the taxpayer established, by

---

8 In *General Motors Corporation v. District of Columbia, supra* (380 *U. S.* 553, 85 *S. Ct.* 1156, 14 *L. Ed. 2d* 68), the court was very recently concerned with the District of Columbia income and franchise tax levying a tax on the income of all foreign and domestic corporations doing business in the district for the privilege of engaging therein, the income attributable to the district to be ascertained, by virtue of administrative regulation, by the ratio of sales therein to sales everywhere. It held that this method of allocation was not

separate accounting proofs, that its income from manufacturing operations in the taxing state amounted to only 17% of its total receipts whereas the formula allocated 80% of the total corporate income to that state for purposes of the tax. See also *Household Finance Corp. v. Director of Division of Taxation, supra,* 36 N. J. 353; *United States Steel Corp. v. Director, Division of Taxation, supra,* 38 N. J. 533.

The matter of discretionary adjustment of the allocation factor is quite another matter. Both the Director and the Division proceeded on the assumption that favorable consideration of a taxpayer's request for adjustment under N. J. S. A. 54:10A–8 is called for only when a showing is made that the formula when strictly applied results in such a palpable misapportionment as to produce an unconstitutional result. The Director's letter rejecting Woolworth's request, while cryptic, was intended to convey this conception, we are advised. Neither agency therefore considered the situation from the standpoint of some adjustment by reason of a lesser degree of unfairness, but still amounting to substantial inequity, as Woolworth now urges to us. (This basis for adjustment was not asserted by the taxpayer in *United States Steel Corp. v. Director, Division of Taxation, supra,* 38 N. J. 533.)

We believe the view taken is an erroneous one and that the Director not only has the authority but also the obligation to consider requests for adjustment on claims of unfairness which do not attain constitutional dimensions. We think the Legislature so intended by N. J. S. A. 54:10A–8.

The 1945 corporation business tax law was proposed in the report of the legislative Commission on Taxation of Intangible Personal Property made in that year. In discussing the matter of allocation formulas and proposing the original form

authorized by the statute and expressly took no position on the constitutionality of a state income tax based on the sales factor alone. However, the language of the opinion would seem to cast doubt on its validity, particularly in its several references to the constant concern of the court that state taxes on multi-state businesses be fairly apportioned.

of section 8 (the original statute taxed only net worth), the report had this to say:

"In order to prevent unfair or even unconstitutional results in given cases, the rigidity of the allocation formulas is relieved by a provision authorizing the tax director to adjust the amount of allocable net worth upon the showing of an inequitable result under the formula. It is believed that such a provision is necessary under the decisions of the United States Supreme Court. *Hans Rees' Sons, Inc. v. North Carolina, ex rel. Maxwell*, 283 *U. S.* 123, 51 *Sup. Ct.* 385 (1931)." (at p. 79)

The Director's own regulations, adopted effective January 1, 1959, appear to us to convey the same thought in Reg. 16:10–4.300, "Discretionary Adjustment of Business Allocation Factor":

"Generally, the allocation formula hereinbefore described will result in a fair apportionment of the taxpayer's net worth and net income within and without New Jersey. However, experience in this and other states which impose similar franchise taxes has shown that due to the nature of certain businesses the formula may work hardships in some cases, and not do justice either to the taxpayer or to the state. Accordingly, provision is made whereby, in such cases, the director may use some other formula which will more accurately reflect the business activity within New Jersey." (at p. 38)

The regulation goes on only to repeat substantially the language of section 8 and to prescribe the procedure for application for adjustment. Perhaps unfortunately, it does not set forth any standards or instances of when or how relief will be considered or afforded thereunder. The regulation has never been judicially considered and we have not been informed of any formal administrative interpretations. We are advised that the Director has only most rarely granted any adjustments and not at all in situations like that here presented.

The soundness of this broader conception of adjustment power is evident to us. The various permissible means of adjustment specified by section 8 are broad indeed, demonstrating a wide view of the authority. As we have said, the three part business allocation factor does not fit too well in many

situations and our statute, as distinct from those of many states, makes no provision for the direct allocation of intangibles or for separate accounting in appropriate circumstances. And we should not overlook the apparent intimation behind the most recent language of the United States Supreme Court in *General Motors Corporation v. District of Columbia, supra,* 380 *U. S.* 553, 85 *S. Ct.* 1156, 14 *L. Ed. 2d* 68, where continued concern was expressed that state taxes be fairly apportioned "to ensure that the methods used display a modicum of reasonable relation to corporate activities within the State." (380 *U. S.,* at *p.* 561, 85 *S. Ct.,* at *p.* 1161, 14 *L. Ed. 2d,* at *p.* 73), to prevent undesirable effects on interstate commerce and the over-all national economy. We think our Legislature intends that taxation of multi-state businesses should be administered on a basis which is equitable, and not merely constitutional, to the corporate taxpayer as well as to the State.

▮ Since the Director did not consider the matter of adjustment of the allocation factor on the basis which we believe he must, the matter should be remanded to him for such consideration, with an opportunity to Woolworth to present proposed methods of adjustment and argument in support thereof. We do not mean to decide whether he should or should not grant any relief. If he decides no relief is equitably warranted we think he should indicate why he reaches that conclusion.

Woolworth does make an appealing presentation, as spelled out early in this opinion, why the three part formula, strictly applied, taking into account only receipts from the foreign subsidiaries, results in an inequitable apportionment to New Jersey. Some unfairness seems to result. But we realize that there is more to the problem than just this.

The considerations involved in discretionary adjustment matters necessarily have to rest to a considerable extent on the competence and expertise of the Director. As has often been said, taxation is an intensely practical matter and an approach must be adopted which will be administratively feasible. *United States Steel Corp. v. Director, Division of Taxa-*

*tion, supra,* 38 *N. J.,* at *p.* 544; *Household Finance Corp. v. Director of Division of Taxation, supra,* 36 *N. J.,* at *p.* 363. The degree of the difference in tax if an adjustment were to be made is a factor which may be considered, but mere dollars should not be controlling. Even relatively small differences in tax can mount up to large sums over the years.

One item deserves special mention. As has been previously said, the statute, *N. J. S. A.* 54:10A–4(k)(1), includes in the income tax base only 50% of dividends received by the taxpayer. The exact reason for the limitation is not apparent, but the possibility exists that it was intended thereby to give some concrete recognition to the problem of fair apportionment where a taxpayer owns substantial amounts of intangibles.

Various possible methods of adjustment looking toward greater fairness were discussed by the parties in their briefs and oral presentations. Included among these[9] were proposals, which counsel to the Director contended would be the only fair modifications, to include Woolworth's intangibles in the business allocation factor as an added fraction or to substitute total asets (tangible and intangible) for the real and tangible personal property fraction in the factor. We express no opinion on any of the suggestions, but assume that they will receive due consideration by the Director.

The judgment of the Division is affirmed with respect to the inclusion of the value of the foreign subsidiaries in the net worth tax base, it is reversed as to the exclusion of the income from such companies in the income tax base and as to the denial of adjustment of the allocation factor, and the

---

[9] All agreed that complete consolidation of the parent and subsidiaries, not only as to net worth and income, but also with respect to the tangible property, sales and payroll in the allocation formula, would be the fairest and best method. *Cf. Household Finance Corp. v. Director of Division of Taxation, supra,* 36 *N. J.,* at *pp.* 361, 363. Woolworth does not request such treatment and it would be impossible since, by reason of British corporation law, Woolworth does not have available and cannot furnish the amount of gross sales of the English company.

matter is remanded to the Director for further proceedings consistent with this opinion. No costs.

*For affirmance in part, reversal in part and remandment*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*Opposed*—None.