SMALL, P.J.T.C.
Corporations doing business in New Jersey are subject to New Jersey’s Corporation Business Tax. N.J.S.A. 54:10A-1 to -32. If all of a corporation’s activities and property are in New Jersey, 100% of its income is subject to tax in New Jersey. If less than 100% of the corporation’s activities and property are in New Jersey, its income is apportioned to New Jersey under a statutory formula. If the corporation maintains a regular place of business outside of New Jersey, the formula is based on the corporation’s payroll, property and sales inside of New Jersey compared to its worldwide payroll, property, and sales. N.J.S.A. 54:10A-6 (“Section 6”). However, if the corporation does not maintain a regular place of business outside of New Jersey, 100% of its income is apportioned to New Jersey and a credit is given for taxes actually paid to other states. N.J.S.A. 54U0A-8 (“Section 8”); N.J.A.C. 18:7-8.3(b). The two formulas generally do not yield identical results because a corporation might not be subject to tax in all of the other states in which it does business, other states may have lower tax rates than New Jersey’s 9% tax rate, other states may calculate the base on which the tax is imposed differently from New Jersey, and other states may allow credits against their tax. See Hess Realty v. Director, Div. of Taxation, 10 N.J.Tax 63, 88 (Tax 1988). Usually an apportionment using the Section 6 three-factor formula produces a smaller tax liability than does a 100% apportionment less credits for taxes paid to other states under Section 8.
In this case, the plaintiff, New Jersey Natural Gas Co. (“NJNG”), claims a right to apportion its income to New Jersey under the more favorable Section 6 three-factor formula. The Director disputes that right, claiming the plaintiff did not maintain *64 a regular place of business outside of New Jersey during the five years which are the subject of this litigation. Plaintiff further claims that even if it does not maintain a regular place of business outside of New Jersey, the application of a tax based on a 100% apportionment to New Jersey with credits for taxes paid to other jurisdictions is inconsistent with the statutory design and violates the Due Process and Commerce Clauses of the United States Constitution.
I find that NJNG does not meet the statutory and regulatory requirements to apportion income under the Section 6 three-factor formula. I further find that, as applied to the facts in this ease, a 100% apportionment with credits for taxes paid to other states under Section 8, although clearly less favorable to NJNG than the Section 6 three-factor formula, does not exceed the constitutional lines that have been drawn by other courts’ interpretations of federal constitutional provisions when applied to similar fact patterns. Accordingly, I grant the Director’s motion for summary judgment denying plaintiff the refunds it seeks and affirm the Director’s assessments.
I.
A. NJNG’s Business
The parties have stipulated the following facts. NJNG is a public utility headquartered in Wall, New Jersey. NJNG provides retail natural gas services to more than 462,000 residential and commercial customers in central and northern New Jersey. During the tax years at issue, NJNG supplied natural gas to retail customers located in New Jersey, and natural gas and excess pipeline capacity to customers located in as many as twenty-one other states.
NJNG’s business activities in New Jersey are subject to the jurisdiction of the New Jersey Board of Public Utilities (the “BPU”).[1] Under the terms of an agreement with the BPU, NJNG *65 must procure a portfolio of pipeline storage and supply resources necessary to satisfy its obligation to provide safe and reliable natural gas, and maintain a supply of natural gas necessary to fulfill the anticipated needs of its customers. To fulfill these obligations, NJNG has implemented a purchasing strategy in which it engages in fixed-price supply contracts (both short and long term), natural gas storage contracts, financial instruments, and spot-market purchases.
NJNG enters into contracts to sell natural gas to customers outside of New Jersey when it has met the demand of its New Jersey customers. Engaging in such ofl-system sales enables NJNG to spread its fixed demand costs incurred to use the services of storage and pipeline companies. NJNG also enters into contracts to release and resell excess capacity rights to natural gas companies in a “capacity release market” when NJNG’s transportation capacity is not needed to meet the demands of its New Jersey customers. NJNG’s off-system sales and capacity release programs, first implemented in 1992, have been approved by the BPU.
During the tax years at issue, NJNG made off-system sales of natural gas to customers located outside central and northern New Jersey and in as many as twenty-one other states. These off-system sales generated, on average, $258,400,000 in annual revenue, of which approximately $129,600,000 was generated from non-New Jersey customers and the remainder from New Jersey customers. During the same period, NJNG generated, on average, total annual revenue of $741,000,000. Pursuant to its agreement with the BPU, NJNG must share the gross profit earned from the off-system sales with its New Jersey customers. The existing sharing formula, in place since 1998 and approved by the BPU, provides that 85% of all profits must be credited to NJNG’s New Jersey customers through reduced customer rates while 15% of all profits may be retained by NJNG.
Because it owns no pipelines outside of New Jersey, NJNG enters into transportation and storage agreements with several interstate pipeline companies, including Texas Eastern Transmis *66 sion, Co., Transcontinental Gas Pipeline, Co., Equitrans, Inc., and Dominion Transmission, Inc., to which NJNG pays service fees to transport its natural gas. NJNG also pays fees to the pipeline companies to store its natural gas outside of New Jersey, principally in Maryland, Pennsylvania, West Virginia, and New York. NJNG has no employees at the out-of-state storage locations.
During the tax years at issue, NJNG paid an average of $17,500,000 in annual fees to these pipeline companies to store its natural gas outside of New Jersey. During that period NJNG maintained, on average, $43,700,000 worth of natural gas inventories. Of that amount, approximately 90% ($39,200,000) was stored outside of New Jersey and 10% ($4,500,000) was stored at two storage facilities within New Jersey which were used to fulfill obligations to New Jersey customers when supply peaked and during emergencies.
B. The Connecticut Office
During the tax years at issue, NJNG employed Ms. Robin Ryan as its supervisor in volume accounting. During this period Ms. Ryan performed employment duties out of her home office in Durham, Connecticut. The home office had no exterior identification, physical markings, separate business address, or listing on business cards or stationary. NJNG withheld all federal and Connecticut employment taxes on wages paid to Ms. Ryan.
Under her employment agreement with NJNG effective May 13, 1997, Ms. Ryan was required to work forty hours per week with at least twenty of those hours occurring during NJNG’s regular business hours. Ms. Ryan’s employment duties consisted of systems coordination and implementation, operating procedure development, accounting services, customer relations, and employee supervision.[2]
*67 For use at the home office, NJNG provided Ms. Ryan with a chair, personal computer with software, printer, and facsimile machine with telecommunications capability, a telephone with two dedicated phone lines, and high-speed internet access. All equipment remained the property of NJNG. Ms. Ryan was required to use the equipment, software, and telecommunications lines solely to complete her employment duties. NJNG was responsible for all expenses related to installation, maintenance, repair, adjustments, software and hardware additions or deletions, and any additional necessary changes to the equipment.
No portion of Ms. Ryan’s salary was designated as payment in lieu of rent for NJNG’s use of her home. Ms. Ryan was reimbursed for business expenses incurred while traveling to NJNG’s New Jersey offices. Ms. Ryan was responsible for federal, state, and local taxes incurred directly or indirectly as a result of working from the home office. Ms. Ryan was responsible for ensuring compliance with applicable zoning regulations and any expenses related to remodeling, alterations, or other telecommuting-related changes to the home office. Ms. Ryan was responsible for any changes to her existing insurance coverage, directly or indirectly related to telecommuting, as well as cost increases due to policy changes. Ms. Ryan was required to supply NJNG with proof of homeowners or renters property insurance. NJNG pro *68 vided personal insurance coverage for Ms. Ryan pursuant to New Jersey’s Worker Compensation laws.[3]
II.
NJNG’s Tax Reporting History
NJNG timely filed its original CBT returns for the fiscal years ended September 30, 1998 and 1999. In these returns, NJNG allocated 100% of its income to New Jersey and reported overpayments of $161,662 and $259,046, respectively. On December 10, 2001, NJNG filed amended CBT returns for fiscal years 1998 and 1999, utilizing the Section 6 apportionment formula to allocate income away from New Jersey. In these returns, NJNG reported overpayments of $463,102 and $372,533, respectively. In its CBT returns for fiscal years 2000, 2001, and 2002, NJNG utilized the Section 6 apportionment formula to allocate income away from New Jersey, reporting overpayments of $2,108,561 in 2000, $1,362,785 in 2001, and $156,484 in 2002.
In a November 24, 2004 Final Audit Determination, the Director rejected NJNG’s amended refund claims for the years 1998 and 1999. On June 29, 2005, after completing an audit of NJNG’s CBT returns for years 2000 through 2002, the Director issued a Notice of Assessment Related to Final Audit Determination to NJNG imposing $1,623,752 of additional CBT and $106,423 of *69 penalties for years 2000, 2001, and 2002. The additional assessment was based on the Director’s conclusion that NJNG did not maintain a regular place of business outside of New Jersey and thus was not entitled to allocate income away from New Jersey under Section 6. The Director, under Section 8, has granted NJNG credits for taxes paid to other jurisdictions in the amounts of $45,829 for 1998, $108,579 for 1999, $5,921 for 2000, $5,263 for 2001, and $8,869 for 2002.
During the tax years at issue, NJNG filed tax returns in New Jersey, Maryland, Pennsylvania, West Virginia, and New York. In Maryland, NJNG filed corporation income tax returns. In Pennsylvania, NJNG filed foreign franchise tax and corporate net income tax returns. In West Virginia, NJNG filed returns and paid business franchise tax, corporate income tax, and personal property tax. NJNG paid an average of $75,000 in annual property taxes in West Virginia during the years at issue. In New York, NJNG filed utility corporation franchise tax returns. NJNG did not file Connecticut corporation business tax returns.
NJNG has filed two complaints in the Tax Court challenging the Director’s Final Determinations which have been consolidated into one case. If NJNG is entitled to utilize the Section 6 apportionment formula, NJNG would have apportionment factors as follows: for FY 1998-87.6416% (65.7312% for NJNG’s short period return for the nine-month period from January 1, 1998 to September 30, 1998, NJNG’s fiscal year end); for FY 1999-86.8707%; for FY 2000-84.9942%; for FY 2001-87.4687%; and for FY 2002-87.1772%. The aggregate tax liability as a result of these adjustments would result in a CBT refund to NJNG in the amount of $1,641,856 plus statutory interest. If NJNG is not entitled to utilize the Section 6 apportionment formula, and instead is required to allocate 100% of its net income to New Jersey with allowance for a credit for taxes paid to other states, the aggregate tax liability as a result of these adjustments would result in additional CBT due from NJNG in the amount of $1,623,752 plus statutory penalties and interest.
*70 HI.
The Right to Allocate Income
Under Section 6, a New Jersey corporation which maintains a regular place of business outside of New Jersey may allocate a portion of its income away from New Jersey in computing income taxable under the CBT. NJNG contends that it is entitled to utilize the Section 6 apportionment formula because it maintains a regular place of business outside of New Jersey, namely Ms. Ryan’s home office. NJNG also contends that, if the Tax Court finds that NJNG does not maintain a regular place of business outside of New Jersey, then NJNG is nevertheless entitled to the application of the Section 6 apportionment formula through the provisions of Section 8. Finally, NJNG contends that to deny it the right to allocate income in accordance with the Section 6 apportionment formula constitutes a violation of the Due Process and Commerce Clauses of the United States Constitution.
The Director contends that NJNG is not entitled to utilize the Section 6 apportionment formula because it does not maintain a regular place of business outside of New Jersey. Thus the Director asserts that NJNG is required under Section 6 to allocate 100% of its net income to New Jersey. The Director further contends that NJNG is not entitled to utilize the Section 6 apportionment formula under Section 8 because other sufficient remedies are available under Section 8 to ensure that there is a fair and proper apportionment representative of NJNG’s activities within New Jersey, including, but not limited to, a credit for taxes paid to other jurisdictions. Director does not address whether, under the four-prong test set forth in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279-80, 97 S.Ct. 1076, 1079-80, 51 L.Ed.2d 326, 331-32 (1977), a 100% apportionment coupled with regulatory tax credits fairly apportions NJNG’s activities within and outside of New Jersey.

TV.

Regular Place of Business
The first question for determination in this case is whether NJNG “maintained a regular place of business” at Ms. Ryan’s *71 home office located in Durham, Connecticut, thereby permitting NJNG to allocate income away from New Jersey in the computation of NJNG’s CBT under Section 6 and the applicable regulations. The statute provides:
In the case of a taxpayer which maintains a regular place of business outside this State other than a statutory office, the portion of its entire net worth to be used as a measure of the tax imposed by subsection (a) of section 5 of P.L.1945, c. 162 (C. 54:10A-5), and the portion of its entire net income to be used as a measure of the tax imposed by subsection (c) of section 5 of P.L.1945, c. 162 (C. 54:10A-5), shall be determined by multiplying such entire net worth and entire net income, respectively, by an allocation factor which is the property fraction, plus twice the sales fraction plus the payroll fraction and the denominator of which is four, except as the director may determine pursuant to section 8 of P.L.1945, c. 162 (C. 54:10A-8)....
[N.J.S.A. 54:10A-6.1[4]
To answer the question of whether NJNG maintained a regular place of business in Connecticut, I must determine whether, for CBT purposes, NJNG “maintained” Ms. Ryan’s home office within the meaning of N.J.S.A. 54:10A-6 and N.J.A.C. 18:7-7.2(a).
For the reasons discussed below, I have determined that NJNG did not “maintain” the home office within the meaning of N.J.S.A. 54:10A-6 and N.J.A.G. 18:7-7.2(a), and therefore, NJNG did not “maintain” a “regular place of business” outside of New Jersey and, accordingly, is not entitled to allocate income away from New Jersey under Section 6.
The CBT imposes a franchise tax on domestic corporations. N.J.S.A. 54:10A-2. The tax is based upon the corporation’s entire net income. N.J.S.A. 54:10A-5. When a corporation maintains a regular place of business outside of New Jersey, the portion of the corporation’s net income allocable to New Jersey for CBT purposes is determined by multiplying its entire net income by an apportionment factor. The apportionment factor is an average of three fractions, derived by dividing the corporation’s property, *72 sales, and payroll in New Jersey by its property, sales, and payroll in all states in which it does business. N.J.S.A. 54:10A-6.[5]
When a taxpayer does not maintain a regular place of business outside of New Jersey, the apportionment factor is 100% of the corporation’s net income. N.J.S.A. 54:10A-6(e); N.J.A.C. 18:7— 7.1(a) and (b). The Director may, however, apply “any other similar or different method calculated to effect a fair and proper allocation of the entire net income ... reasonably attributable to the State,” when the Section 6 apportionment formula “does not properly reflect the activity, business, receipts, capital ... or entire net income of a taxpayer reasonably attributable to the State....” N.J.S.A 54:10A-8; see also N.JAC. 18:7-18.3(a) and N.JAC. 18:7-10.1.
A regular place of business is “any bona fide office (other than a statutory office) ... of the taxpayer which is regularly maintained, occupied and used by the taxpayer in carrying on its business and in which one or more regular employees are in attendance.” N.JAC. 18:7-7.2(a). “The taxpayer must be directly responsible for the expenses incurred in maintaining the regular place of business and must either own or rent the facility in its own name and not through a related person or entity.” N.J.A.C. 18:7-7.2(a)(2). “The regular place of business should be identifiable as belonging to the taxpayer by, for example, reflecting the taxpayer’s name on the exterior and interior of the building and being listed in the taxpayer’s name in a telephone book.” Ibid. Furthermore, “[t]he taxpayer must regularly maintain, occupy and use the premises by employing one or more regular employees who are in attendance during normal working hours.” N.JAC. 18:7-7.2(a)(3). The “employee in attendance [must] perform[] significant duties related to the business of the taxpayer.” N.J.A.C. 18:7-7.2(a)(1)..
There have been a number of eases construing the language of Section 6 and the Director’s regulatory definition of a regular *73 place of business. See cases cited in River Sys., Inc. v. State, Dept. of Treasury, Div. of Taxation, 19 N.J.Tax 599, 607 (Tax 2001), aff'd, 358 N.J.Super. 287, 817 A.2d 964 (App.Div.2003), and as discussed below. In Hoeganaes Corp. v. Director, Div. of Taxation, 145 N.J.Super. 352, 361-62, 367 A.2d 1182 (App.Div. 1976), the Appellate Division found that out-of-state employees’ homes did not constitute regular places of business. The court noted “Ltjhere are many factors that might constitute the maintenance of an office for the purpose of allocation,” and relied on the following five factors in making its decision: “(1) Name of taxpayer in telephone directory, on building directory if there is one, on door leading to entrance of office or otherwise displayed on the office exterior; (2) Stationery and calling cards showing office address; (3) Storage of inventories or display samples at location in question; (4) A written or oral lease for the space involved and the direct or indirect payment of rent; (5) A written or oral agreement for the maintenance of an office by the agent or agency on behalf of the taxpayer.” (citation omitted).
In that case, plaintiff Hoeganaes manufactured powdered metals and maintained its principal office and factory in Riverton, New Jersey. Id. at 355-61, 367 A2d 1182. For the tax year at issue, Hoeganaes made sales in more than forty states as well as in foreign countries. Ibid. The court rejected Hoeganaes’ assertion that its salesperson’s home offices constituted regular places of business where Hoeganaes neither owned nor rented space outside of New Jersey for its salespersons, where no other regular employees were in attendance at the home offices while the salespersons were away at customers’ places of business, and where Hoeganaes had virtually no control over the furnishing, decorating, location, size, or upkeep of the salesmen’s home offices. Ibid.
In Rocappi, Inc. v. Director, Div. of Taxation, 182 N.J.Super. 163, 3 N.J.Tax 311, 440 A.2d 96 (Tax 1981), the Tax Court similarly held that a salesperson’s use of an out-of-state office maintained by the taxpayer’s parent corporation did not constitute a regular place of business of the taxpayer. In that case, plaintiff Rocappi was one of several subsidiaries of a parent corporation *74 doing business in New Jersey. Id. at 312-25, 440 A2d 96. Roeappi did business in office buildings rented by its parent, and reimbursed its parent for rent, payroll, and office expenses by paying it a portion of the proceeds on items Roeappi sold. Ibid. The court noted that Roeappi’s employees were not in regular attendance at the offices, and that Roeappi “did not control the premises” but rather the parent did. Ibid. “Although Roeappi had some involvement in the operation of the offices—for instance, it provided some training for the salesmen—most of its involvement was indirect.” Id. at 319, 440 A2d 96.
In Shelter Dev. Corp. v. Director, Div. of Taxation, 6 N.J.Tax 547 (Tax 1984), the Tax Court held that an out-of-state office leased by the taxpayer’s parent company and used by the taxpayer did not constitute a regular place of business. In that ease, plaintiff Shelter Development Corp. was a New Jersey corporation engaged in commercial property rentals in Bogota, New Jersey. Id. at 548-57. The company claimed to maintain an office in New York City, which was leased by the parent company of its affiliated group of companies. Ibid. The taxpayer paid no rent for the New York office space, nor did it pay any New York franchise or property taxes. Ibid. Shelter Development presented no evidence that the management fee it paid included any reimbursement for rent, and its employees were primarily full-time employees of the parent corporation. Ibid. On these facts, the court found that Shelter Development failed to prove that it regularly maintained, occupied, and used the out-of-state location as a regular place of business, or that it had one or more employees in attendance at the claimed office location. Ibid.
In SMZ Corp. v. Director, Div. of Taxation, 5 N. J.Tax 232 (Tax 1982), rev’d and rent’d on other grounds, 193 N.J.Super. 305, 473 A.2d 982 (App.Div.1984), this court found that an out-of-state gasoline filling station owned by a New Jersey real estate company and leased to a third party did not constitute a regular place of business. In that case, plaintiff SMZ was a New Jersey corporation engaged in business as a real estate holding company. Id. at 307-17, 473 A.2d 982. SMZ maintained a statutory place of business, held a majority of its property in New Jersey, and *75 claimed, to maintain a regular place of business in Connecticut. Ibid. On review, the Appellate Division affirmed the Tax Court’s finding that SMZ did not maintain a regular place of business in Connecticut under Section 6 and N.J.AC. 18:7-7.2(a). Ibid. The Appellate Division based its conclusion on the fact that “SMZ merely lease[d] a gasoline station ... on a net lease basis, to a tenant and [did] not maintain a regular place of business in Connecticut within the meaning of N.J.S.A. 54:10A-6 and N.J.A.C. 18:7-7.2(a).” Id. at 315, 473 A.2d 982.
In River Systems, this court found that an out-of-state office maintained by a related corporation which employed the taxpayer’s alleged employees did not constitute a regular place of business. 19 N.J.Tax at 606. River Systems was incorporated in New Jersey and claimed that it maintained a regular place of business in New City, New York, where it engaged in marketing and sales services. Id. at 601-11. It paid a related company a fixed sum as rent for the New York City location, which was adjusted at the end of the year depending on the amount of sales solicited. Ibid. River Systems was charged for telephone usage according to the specific calls made on its behalf, as well as utility expenses that were allocated based on relative sales. Ibid. There was no written lease for the office, and the employees at the office were paid by the related corporation. Ibid. Management and supervisory costs were based on relative sales. Ibid.
In concluding that the New City office did not constitute a regular place of business, this court noted that in order for an out-of-state office to qualify as a regular place of business, the taxpayer must be “directly responsible for the expenses incurred in maintaining the regular place of business and must own or rent the facility in its own name ... [and must employ] one or more regular employees who are in attendance.” Id. at 607. The court found that, since the employees engaged in the marketing and sales services were all employees of the related corporation, River Systems had no regular employees at the office under the definition found in N.J.A.C. 18:7-7.2(a). Ibid. The court also found that, since there was no written lease or reimbursement contract, River *76 Systems did not pay rent and thus did not maintain the office under N.J.S.A. 54:10A-6. Ibid.
In this case, the Director argues that NJNG does not maintain a regular place of business outside of New Jersey within the meaning of Section 6 and N.J.A.C. 18:7-7.2(a). Although NJNG contends that it maintains a regular place of business at Ms. Ryan’s home office in Durham, Connecticut, the facts demonstrate otherwise.
NJNG neither owns, leases, nor pays rent for Ms. Ryan’s home office. NJNG also pays no utility expenses for the home office. -As noted above, the regulation specifies that a regular place of business is “any bona fide office ... of the taxpayer which is regularly maintained ... by the taxpayer in carrying on its business____” N.J.A.C. 18:7-7.2(a). “The taxpayer [not Ms. Ryan] must be directly responsible for the expenses incurred in maintaining the regular place of business and must either own or rent the facility in its own name ----” N.J.A.C. 18:7-7.2(a)(2) (emphasis supplied).
Ms. Ryan was responsible for all “ongoing expenses” directly or indirectly related to the home office, namely rent (or mortgage payments) and utility expenses. No portion of Ms. Ryan’s salary was designated as payment in lieu of rent for NJNG’s use of her home. Beyond rent and utilities, Ms. Ryan bore the expense of insurance, taxes, remodeling and alteration costs, costs incurred to comply with zoning ordinances, and any necessary office equipment beyond a chair, personal computer, software, printer and facsimile machine, and telephone. NJNG did pay appropriate Connecticut employee taxes with respect to Ms. Ryan’s employment by NJNG in Connecticut.
For purposes of this case, the rulings in Hoeganaes, Skelter Development, and River Systems are on point. In Hoeganaes, supra, in which the court found the out-of-state employee’s home did not constitute a regular place of business, the court noted the “ordinary and well-understood meaning of the regulation” is that to “‘[m]aintain’ means to ‘bear the expense of the subject, i.e., pay rent.” 145 N.J.Super, at 359, 367 A.2d 1182. In Shelter *77 Development, supra, the court found that an out-of-state office was not regularly maintained by the taxpayer where the office was leased by the taxpayer’s parent company and where the taxpayer paid no rent for the New York location nor presented any evidence that the management fee it paid included any reimbursement for rent. 6 N.J.Tax at 547. The court in River Systems, supra, ruled that an out-of-state office was not regularly maintained where the taxpayer was only indirectly responsible for rental payments made as a fixed sum to a related corporation adjusted at year end based on specific sales solicited. 19 N.J.Tax at 607. The fact that Ms. Ryan, not NJNG, was directly responsible for rent or mortgage payments, utilities, and other ongoing expenses of the home office precludes NJNG from arguing that it maintained Ms. Ryan’s home office within the meaning of N.J.S.A. 54:10A-6 and N.J.A.C. 18:7-7.2(a).
In General Trading Co. v. Director, Div. of Taxation, 83 N.J. 122, 138, 416 A.2d 37 (1980), our Supreme Court set forth the legal principle that “a business decision will be given its tax effect according to what actually occurred,” and that a taxpayer corporation makes certain business decisions that have certain tax consequences and is then bound by those decisions. The Court held that “a voluntary business decision ‘is to be given its tax effect in accord with what actually occurred and not in accord to what might have occurred.’ ” Id. at 136, 416 A2d 37 (quoting Commissioner v. National Alfalfa Dehydrating and Milling Co., 417 U.S. 134, 148, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717, 727 (1974)). In this case, NJNG could have purchased, leased, or rented office space outside of New Jersey and paid the ongoing expenses necessary to maintain such an office in its own name. However, it chose to operate through Ms. Ryan’s home office and require her to bear the ongoing expenses of maintaining the home office. It would appear that NJNG wished to have Ms. Ryan’s home office qualify as a regular place of business for New Jersey CBT purposes, but avoid that characterization for Connecticut tax purposes. For example, maintenance of Ms. Ryan’s home office, through owning, leasing, or making rental or mortgage payments for the office, would seem to subject NJNG to Connecticut income taxes. See, *78 e.g., Conn. Gen.Stat. § 12—214(a)(1) (providing that “[e]very company ... shall pay, annually, a tax or excise upon its franchise for the privilege of carrying on or doing business, owning or leasing property within [Connecticut] in a corporate capacity or ... maintaining an office within [Connecticut]”). While I need not inquire as to why a business decision was made, I “cannot ignore or disregard the manner in which [NJNG] chose to organize and run its business.” Cf. River Systems, supra, 19 N.J.Tax at 609.
NJNG also contends that it is entitled to utilize the Section 6 apportionment formula because its out-of-state storage locations and tax filings and payments to other states indicate that it maintained regular places of business outside of New Jersey. NJNG bases this argument on the court’s holding in Hoeganaes, supra, which addressed whether the nature of a taxpayer’s business should be taken into account when determining whether it maintains a place of business outside of New Jersey. 145 N.J.Super. at 361, 367 A.2d 1182. That court emphasized:
The ascertainment of whether the taxpayer maintains an office outside the state to which gross receipts may be assigned depends entirely upon the circumstances. There are many factors that might constitute the maintenance of an office for the purpose of allocation. But what might be sufficient in one ease would be inadequate in another; it is usually the combination of factors that add up to the necessary requirement. In other words the essentials may differ with the type of business, the type of agency or employment contract involved or the manner in which the taxpayer conducts its business.
Ubid. (citing Stradley & Knukstein, Corporate Taxation and Procedure in Pennsylvania 230 (2d ed. 1952)).]
Based on this language, NJNG asserts that under a totality of the circumstances, NJNG’s storage of $39,200,000 (90%) of its natural gas inventory outside of New Jersey and its tax filings and payments to other states supports its contention that it maintains offices outside of New Jersey. Again, the facts demonstrate otherwise.
NJNG has no “regular employees” at the out-of-state storage locations. As noted above, the regulation specifies that “[t]he taxpayer must regularly maintain, occupy and use the premises by employing one or more regular employees who are in attendance during normal working hours.” N.J.A.C. 18:7-7.2(a)(3). “A regular employee must be under the control and direction of the *79 taxpayer in transacting the taxpayer’s business and/or performing work on behalf of the taxpayer.” N.J.A.C. 18:7-7.2(a)(4). The fact that NJNG has no employees at the out-of-state storage locations precludes the locations from constituting regular places of business within the meaning of N.J.S.A. 54:10A-6 and N.J.A.C. 18:7-7.2(a).
NJNG’s contention that it maintains a regular place of business in the states where it files tax returns and pays tax is also of no import. “The mere fact that a taxpayer is subject to an income or franchise tax in other jurisdictions shall not be determinative as to whether the taxpayer maintains a regular place of business outside of New Jersey where taxable status in that jurisdiction is based on criteria other than a regular place of business.” N.J.A.C. 18:7-7.2(c).
The record does not indicate whether, and NJNG has not asserted that, NJNG maintained regular places of business in Maryland, Pennsylvania, West Virginia, and New York during the years at issue. It appears that these states tax NJNG on its sales into, or property in, those states. Following the Director’s regulation, the fact that NJNG pays taxes in other states is not alone sufficient to conclude that it maintains a regular place of business outside of New Jersey because these states tax NJNG in part based on criteria other than a regular place of business, namely, NJNG’s sales and property within their state.
The facts in this case come much closer to meeting the standards of the regulations defining a regular place of business than did the facts in Hoeganaes, supra. In that ease, the court held that the out-of-state home offices of the plaintiffs salespersons were not the plaintiffs regular places of business within the meaning of Director’s regulation. 145 N.J.Super. at 357-62, 367 A. 2d 1182 (this because the salespersons “spent only 20% to 25% of their time in their ‘home’ offices,” because no other regular employees attended the offices while the salespersons were absent, because the home offices lacked any exterior identification of the plaintiff, and because the salespersons bore the ongoing *80 expenses of maintaining their home offices, i.e. rent (or mortgage payments) and utilities).
In this ease, it is uncontested that Ms. Ryan regularly attended her home office during NJNG’s business hours, that Ms. Ryan performed significant employment duties from her home office with respect to NJNG’s out-of-state business activities, and that Ms. Ryan’s employment duties and scope of work were extensively controlled by NJNG during Ms. Ryan’s period of employment. However, the fact that Ms. Ryan bore the ongoing expenses of maintaining the home office within the meaning of Director’s regulation precludes NJNG from arguing that it maintained the office as a regular place of business outside of New Jersey.[6]
Simply owning property or maintaining inventory in other states does not constitute doing business in other states if there is no bona fide office as required by the Director’s regulation. In Hess Realty, supra, the taxpayer maintained an extensive portfo *81 lio of real estate outside of New Jersey. 10 N.J.Tax at 77-80. It managed those properties and collected rents from them, but it did not have an office meeting the standards of Hoeganaex and the Director’s regulation. Ibid. This court ruled that the plaintiff did not maintain a regular place of business outside of New Jersey within the meaning of N.J.S.A. 54:10A-6 and accordingly was not entitled to allocate its income using the Section 6 apportionment formula. Ibid.
A corporation cannot make itself eligible for apportionment under N.J.S.A. 54:10A-6 if it does not maintain a regular place of business outside of New Jersey. Because NJNG has failed to establish that it maintains a regular place of business outside of New Jersey, NJNG is not entitled to allocate income away from New Jersey under N.J.S.A. 54:10A-6.
V.
Fairness of Section 8 Apportionment
Having determined that NJNG is not entitled to allocate income away from New Jersey under Section 6, I turn to the adequacy of the Director’s allowance of a credit for taxes paid to other jurisdictions under Section 8. In Hess Realty, supra, 10 N.J.Tax at 66, this court summarized the Director’s discretion to modify the strict 100% apportionment where a taxpayer fails to maintain a regular place of business outside of New Jersey. This court stated:
If a taxpayer, however, does not maintain a regular place of business outside this State other than a statutory office then 8 6 mandates that the taxpayer's business allocation factor shall be 100%. In other words, all of the taxpayer’s business activity is attributed to this State and thus 8 6 requires the taxpayer, without apportionment, to include all of its net income and net worth as the measure of its New Jersey franchise tax.
If the business allocation factor that is required to be used pursuant to the statutory direction m 8 6, however, does not do justice to either the taxpayer or the State because it does not fairly reflect a taxpayer’s New Jersey business activities, N.J.S.A 54:10A-8 (8 8) gives the Director discretionary authority to adjust the business allocation factor. This broad authority is designed to enable the Director to make any number of adjustments which are ‘calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to [this] State.’
*82 [Ibid, (citations omitted).]
Describing the Director’s discretionary authority, N.J.S.A. 54:10A-8 and the implementing regulations provide:
If it shall appear to the commissioner that an allocation factor determined pursuant to section 6 does not properly reflect the activity, business, receipts, capital, entire net worth or entire net income of a taxpayer reasonably attributable to the State, he may adjust it by:
(a) excluding one or more of the factors therein;
(b) including one or more other factors, such as expenses, purchases, contract values (minus subcontract values);
(c) excluding one or more assets in computing entire net worth; or
(d) excluding one or more assets in computing an allocation percentage; or
(e) applying any other similar or different method calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State.
[N.J.S.A. 54:10A-8; N.J.A.C. 18:7-8.3(a); NJ.A.C. 18:7-10.1.]
With these concepts in mind I now turn to the facts in this ease. The following three tables summarize NJNG’s business activities within and outside of New Jersey during the five years at issue.[7],[8]
*83 [[Image here]]
[[Image here]]
*84 [[Image here]]
As the above tables illustrate, the tax as a percentage of income allocated to New Jersey using the Section 6 apportionment formula is 9% in each year. Using the Director’s 100% apportionment less tax credits granted under Section 8, the tax as a percentage of the income allocated under Section 6 (the “benchmark” of apportionment formula—see infra) ranges from 9.38% to 10.41%, amounting to an increase over the standard of taxation under Section 6 of between 4.18% and 15.66%. See Hess Realty, supra, 10 N.J.Tax at 86. “The three-part formula has not only obtained the approval of the United States Supreme Court, but is considered the ‘benchmark against which other apportionment formulas are judged.’ ” Ibid, (citing Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 170, 103 S.Ct. 2933, 2943, 77 L.Ed.2d 545, 556 (1983)).
NJNG asserts that a 100% apportionment factor coupled with regulatory tax credits does not work a fair and proper apportionment of NJNG’s income, and therefore, NJNG is entitled to the application of the Section 6 apportionment formula through the provisions of N.J.S.A. 54:10A-8. The Director asserts that its 100% apportionment with credits for taxes paid to other states under authority of N.J.S.A 54:10A-8 and N.J.A.C. 18:7-10.1 works a fair and proper apportionment of NJNG’s income. Although Director’s apportionment formula may not be the most *85 precise or preferred formula, I find that, based on the evidence in the record, it is a fair approximation of the value of NJNG’s activities within and outside of New' Jersey.
The Director has discretion under Section 8 to adjust any factor in the Section 6 apportionment formula to effect a fair and proper apportionment of a taxpayer’s income. Our Supreme Court has discussed the purpose of Section 8:
In order to prevent unfair or even unconstitutional results in given cases, the rigidity of the allocation formulas is relieved by a provision authorizing the tax director to adjust the amount of allocable net worth upon the shoving of an inequitable result under the formula. It is believed that such a provision is necessary under the decisions of the United States Supreme Court.
[F.W. Woodworth Co. v. Director, Div. of Taxation, 45 N.J. 466, 498, 213 A.2d 1 (1965) (citations omitted).)
That court addressed the Director’s broad discretion as follows:
The considerations involved in discretionary adjustment mailers necessarily have to rest to a considerable extent on the competence and expertise of the Director. As has often been said, taxation is an intensely practical matter and an approach must be adopted which will be administratively feasible. The degree of the difference in tax if an adjustment were to be made is a factor which may be considered, but mere dollars should not be controlling. Even relatively small differences in tax can mount up to large sums over the years.
[Id. at 499, 213 A2d 1 (citations omitted).)
Indeed, the court in Hess Realty, supra, even noted that, “not only does the Director have broad adjustment authority, but he also has an obligation to adjust a particular allocation formula if it is unfair in that it does not ‘effect a fair and proper allocation of the [taxpayer’s] entire net income ... reasonably attributable to the State.’” 10 N.J.Tax at 81-82 (citing F.W. Woolwoorth, supra, 45 N.J. at 497, 213 A.2d 1). In that case, this court found the Section 6 apportionment formula was more appropriate than the Director’s 100% apportionment plus regulatory credits because the Director “did not allow full credit for income taxes paid by [the plaintiff] to other taxing jurisdictions and provided no credit for net worth or capital taxes paid by [the plaintiff] to other states.” Id. at 83. Application of the Director’s apportionment resulted in revised taxes of 250% of the income portion computed under the Section 6 apportionment formula, and constituted income base tax increases of over 150% for both years at issue. Id. at 88. This court found that the increases in business apportionment factors *86 and effective tax rates bore no relevant relationship to the plaintiffs level of activities within or outside of New Jersey. Id. at 91. Further, though now eliminated from CBT consideration, the revised net worth taxes attributed 92.5% of the plaintiffs net worth, essentially the full value of its assets, to New Jersey even though the facts revealed that only 12% were actually attributable to New Jersey. Ibid.
The facts in this case are distinguishable from, those in Hess Realty. The parties stipulated that the Director gave NJNG full credits for taxes paid to other jurisdictions. NJNG claims that even with the provision of full credits, the Director’s apportionment unfairly reflects NJNG’s activities within and outside of New Jersey, in part due to its inclusion of 85% of NJNG’s off-system sales in New Jersey sales.
The Director contends that, pursuant to NJNG’s agreement with the BPU, 85% of NJNG’s profits obtained from off-system sales must be thrown back to New Jersey customers. The BPU agreement states in pertinent part, “[t]he existing sharing formula, which has been in place since 1998, provides 85% of all [profit] margins to customers and 15% to the Company.” In asserting that 85% of profits are allocable to New Jersey, the Director misconstrues the Director’s sourcing rules. N.J.A.C. 18:7-8.8 provides that sales receipts of tangible personal property are sourced to New Jersey if “shipments are made to points in New Jersey” or “possession is transferred in New Jersey.” Pursuant to the Director’s regulation, sales receipts, not profits, are allocated where earned or where possession is transferred.[9]
Even with the Director’s misapportionment of 85% of NJNG’s profits from off-system sales as New Jersey sales, such does not, as applied to the facts of this case, establish a degree of unfairness or inadequacy such that this court should require the use of the Section 6 apportionment formula over that of the Director’s 100% apportionment with credits given for taxes paid to other states. *87 During the years at issue, NJNG maintained. 87.2% of its total property within New Jersey.[10] During those same years, NJNG generated off-system sales of $258,400,000 in average annual revenue, of which approximately 50% ($129,600,000) was generated from non-New Jersey customers—approximately 17.5% of NJNG’s total annual revenue derived in all states.* [11]
The Director’s apportionment of NJNG’s off-system sales to New Jersey customers results in a misapportionment of only 17.5% of its total sales during the years at issue. Such an apportionment increases NJNG’s business apportionment factors from 87.7% to 98.9%, from 94.9% to 98.8%, from 88.4% to 99.9%, from 86.4% to 99.9%, and from 87.2% to 99.8%, for the tax years 1998 through 2002, respectively. This differential would increase NJNG’s effective tax rate from 9.00% for all years at issue to 10.17%, 9.38%, 10.17%, 10.41% and 10.30% for 1998 through 2002, respectively. The resulting income base differential of between 4.18% and 15.66%, and effective tax rate differential of only .38% to 1.5%, does not establish a degree of unfairness or inadequacy sufficient to override the discretion vested in the Director to effect an apportionment that fairly and reasonably reflects NJNG’s activities in New Jersey.
The object of formulary apportionment is to effect a fair and proper apportionment of a taxpayer’s business activities between different states. The court in Hess Beatty, supra, found the benchmark Section 6 apportionment formula applicable to the plaintiff in that case because, in the absence of additional evidence, it was a fair representation of the plaintiffs business activities within New Jersey. The difference between the Section 6 apportionment formula and the crediting provisions of Section 8 was of a magnitude of approximately 250%. 10 N.J.Tax at 89-90. In this case, that difference is only 4.18% to 15.66%, resulting in increased *88 effective tax rates of .38% to 1.5% during the years in issue. I find that, in this case, a 100% apportionment factor coupled with regulatory credits is fairly related to NJNG’s activities within New Jersey. It is this degree that controls rather than the mere dollars at stake. Cf F.W. Woolworth, supra, 45 N.J. at 500, 213 A.2d 1. Therefore, I find that NJNG is not entitled to utilize the Section 6 apportionment formula to allocate income away from New Jersey under authority of N.J.S.A. 54:10A-8.
VI.
Constitutionality of Section 8 Apportionment
Having determined that NJNG is not entitled to the application of the Section 6 apportionment formula through the provisions of Section 8, I now turn to NJNG’s contention that the Director’s proposed 100% apportionment with credits for taxes paid to other states is unconstitutional under the Due Process and Commerce Clauses of the United States Constitution. In determining whether a state tax violates these clauses, New Jersey courts apply the four-prong commerce clause test set forth in Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279-80, 97 S.Ct. 1076, 1079-80, 51 L.Ed.2d 326, 331-32 (1977). E.g. American Trucking Assns. v. State, 180 N.J. 377, 401, 852 A.2d 142 (2004); Stryker Corp. v. Director, Div. of Taxation, 168 N.J. 138, 152, 773 A.2d 674 (2001); Lanco, Inc. v. Director, Div. of Taxation, 379 N.J.Super. 562, 565, 879 A.2d 1234 (App.Div.2005), aff'd, 188 N.J. 380, 908 A.2d 176 (2006), cert. denied, — U.S. -, 127 S.Ct. 2974, 168 L.Ed.2d 702 (2007); Delmarva Power & Light Co. v. Director, Div. of Taxation, 23 N.J.Tax 188, 208 (Tax 2006); Titan Sports, Inc. v. State Athletic Control Bd., 12 N.J.Tax 214, 228 (Tax 1992). I note also that in analyzing cases that test a statute’s constitutionality under the Due Process Clause and the Commerce Clause, the Supreme Court has used the Commerce Clause test to measure the constitutionality of both clauses. That is if a statute passes Commerce Clause scrutiny, it also passes due process scrutiny. However, if a statute passes due process scrutiny, it may not satisfy the requirements of the Commerce Clause. See, e.g., *89 Quill Corp. v. North Dakota, 504 U.S. 298, 305-06, 112 S.Ct. 1904, 1909, 119 L.Ed. 2d 91, 101-02 (1992) (citing Tyler Pipe Indus., Inc. v. Washington State Dep’t of Revenue, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987), the Court noted that “while a State may, consistent with the Due Process Clause, have the authority to tax a particular taxpayer, imposition of the tax may nonetheless violate the Commerce Clause”); International Harvester Co. v. Department of Treasury, 322 U.S. 340, 353, 64 S.Ct. 1019, 1032-33, 88 L.Ed. 1313, 1321 (1944) (Rutledge, J., concurring in part and dissenting in part) (providing that while, to some extent, the Due Process and Commerce Clauses overlap, “[tjhere may be more than sufficient factual connections, with economic and legal effects, between the transaction and the taxing state to sustain the tax as against due process objections. Yet [the transaction] may fall because of its burdening effect upon [interstate] commerce.”).
Under this test, a state tax on interstate sales will sustain a Commerce Clause challenge “when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.” Complete Auto Transit, supra, 430 U.S. at 279, 97 S.Ct. at 1079, 51 L.Ed.2d at 331. In 1995 the United States Supreme Court reaffirmed the four-prong test set forth in Complete Auto Transit and explained that a fairly apportioned tax must be both internally and externally consistent. Oklahoma Tax Comm’n v. Jefferson Lines, Inc., 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995). That Court explained the central purpose of the second prong of the Complete Auto Transit test is “to ensure that each State taxes only its fair share of an interstate transaction.” Id. at 184-85, 115 S.Ct. at 1338, 131 L.Ed.2d at 271 (citing Goldberg v. Sweet, 488 U.S. 252, 260-61, 109 S.Ct. 582, 588, 102 L.Ed.2d 607, 616 (1989)). “This principle of fair share is the lineal descendant of ... Lthe] prohibition of multiple taxation, which is threatened whenever one State’s act of overreaching combines with the possibility that another State will claim its fair share of the value taxed: the portion of value by which one State exceeded its fair share would be taxed *90 again by a State properly laying claim to it.” Ibid. The Court explained internal and external consistency as follows:
Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to lake more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax.
External consistency, on the other hand, looks not to the logical consequences of cloning, but to the economic justification for the State’s claim upon the value taxed, to discover whether a State’s tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State ... [T]he threat of real multiple taxation (though not by literally identical statutes) may indicate a State’s impermissible overreaching. It is to this less tidy world of real taxation that we turn now, and at length.
[Oklahoma Tax Comm’n, supra, 514 U.S. at 185, 115 S.Ct. at 1338, 131 L.Ed.2d at 271-72; see also Goldberg, 488 U.S. at 262, 109 S.Ct. at 589, 102 L.Ed.2d at 617.]
In other words, “[t]o be internally consistent, a tax must be structured so that if every State were to impose an identical tax, no multiple taxation would result.” Goldberg, supra, 488 U.S. at 261, 109 S.Ct. at 589, 102 L.Ed.2d at 617. If the internal consistency test is met, “a formula-produced assessment will only be disturbed when the taxpayer has prove[n] by ‘clear and cogent evidence’ that the income attributed to the State is in fact ‘out of all appropriate proportions to the business transacted ... in that State,’ ... or has ‘led to a grossly distorted result.’ ” Moorman Mfg. Co. v. Bair, 437 U.S. 267, 274, 98 S.Ct. 2340, 2345, 57 L.Ed.2d 197, 205 (1978) (emphasis added). This latter standard refers to the external consistency test, and “asks whether the State has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed.” Goldberg, supra, 488 U.S. at 262, 109 S.Ct. at 589, 102 L.Ed.2d at 617 (citing Container Corp. of Am. v. Franchise Tax Bd., 463 U.S. 159, 169, 103 S.Ct. 2933, 2941, 77 L.Ed.2d 545, 556 (1983)).
*91 At issue in this ease is whether, under the second prong of the Complete Arito Transit test, the Director’s 100% apportionment plus credits given for taxes paid to other states fairly apportions NJNG’s income. NJNG first argues that the Director’s regulation requiring 100% of its CBT be allocated to New Jersey violates internal consistency. NJNG asserts that, if 100% of its CBT income were to be allocated to New Jersey, and as NJNG has done, allocated a portion of its income to other states in which it does business, it would mean that more than 100% of NJNG’s income would be taxed as a result of NJNG engaging in interstate commerce. NJNG alleges that this imposes a greater burden on interstate commerce than on intrastate commerce and therefore, violates internal consistency. The Director asserts that discretionary tax credits given to NJNG under Section 8 eliminate the risk of multiple taxation due to a 100% apportionment.
I conclude that the CBT applied to NJNG is internally consistent. Included in the numerator of the Section 6 apportionment formula are sales, services, and property rentals made in-state. If every taxing jurisdiction applied the CBT, no more than 100% of a corporation’s business income would be taxed, as each item of a corporation’s sales, property, and payroll represented in the numerator of the apportionment fraction can be attributable to only one jurisdiction. Cf Unisys Corp. v. Pennsylvania Bd. of Fin. & Revenue, 571 Pa. 139, 812 A.2d 448, 460 (2002). Moreover, if every state granted full tax credits for taxes paid to other states, as the Director has granted NJNG in this case, then an interstate taxpayer “would pay a tax to only one state, and he would receive a credit against that tax in other states in which he operated.” Walter Hellerstein, Is “Internal Consistency” Foolish?: Reflections on an Emerging Commerce Clause Restraint on State Taxation, 87 Mich. L.Rev. 138, 183 (1988) (noting “[t]he crediting device thus shields the interstate business from the risk of multiple taxation that the ‘internal consistency’ doctrine was designed to prevent.”). The CBT causes no risk of multiple taxation and is thus internally consistent and facially valid.
NJNG also argues a 100% apportionment coupled with regulatory credits does not reasonably reflect NJNG’s economic activity *92 within New Jersey and therefore the CBT, as applied to NJNG, is externally inconsistent. The Director contends otherwise. Although the Director’s 100% apportionment formula may not be the most precise or preferred formula, See Container Corp., supra, 463 U.S. at 166, 103 S.Ct. at 2940, 77 L.Ed.2d at 554, I find that NJNG has failed to prove by “clear and cogent evidence” that Director’s apportionment works a degree of unfairness that rises to constitutional dimensions. Cf. Moorman, supra, 437 U.S. at 274, 98 S.Ct. at 2345, 57 L.Ed.2d at 205; Hess Realty, supra, 10 N.J.Tax at 85.
Here, because I find that the CBT is internally consistent and thus facially valid, NJNG must prove by “clear and cogent evidence” that the income attributed to New Jersey by the 100% apportionment factor with credits is “out of all appropriate proportion to the business transacted” in New Jersey or has “led to a grossly distorted result.” Moorman, supra, 437 U.S. at 274, 98 S.Ct. at 2345, 57 L.Ed.2d at 205. This is determined by asking whether the disparity of assessments using a 100% apportionment coupled with regulatory tax credits and the Section 6 apportionment formula is within the constitutional margin of error. See Unisys, supra, 812 A.2d at 456-57. In Hans Rees’ Sons, Inc. v. North Carolina, 283 U.S. 123, 135-36, 51 S.Ct. 385, 389, 75 L.Ed. 879, 905-07 (1931), the United States “Supreme Court disapproved taxation under a single-factor method where the foreign corporation demonstrated that, while approximately eighty percent of its income was allocated to North Carolina under the apportionment formula, less than twenty-two percent of the corporation’s income actually had its source in the corporation’s operations within North Carolina.” Unisys, supra, 812 A.2d at 456. The Court rejected “a more than 250% difference between [the] assessment calculated under a state’s apportionment formula and the amount of income actually attributable to [the taxpayer] corporation’s operations carried on within a state [as being] outside the allowable margin of error” and thus found it unconstitutional. Ibid. (citing Unisys Corp. v. Pennsylvania, 726 A.2d 1096, 1102 (Pa. Cmwlth.1999)). In Norfolk & W.R. Co. v. Missouri State Tax Comm’n, 390 U.S. 317, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968), the *93 Supreme Court similarly found that a 160% “difference in tax due under a state’s apportionment formula and under a formula using actual values [was] also outside the [constitutional] margin of error.” Unisys, supra, 812 A.2d at 456. In contrast, the Supreme Court ruled in Container Corp. and Moorman the approximate 14% and 48% discrepancies alleged by the taxpayers to be constitutionally unfair ■ were within the permissible margin of error, and thus constitutional. See Container Corp., supra, 463 U.S. at 183-84, 103 S.Ct. at 2949-50, 77 L.Ed.2d at 564-65 and Moorman, supra, 437 U.S. at 280-81, 98 S.Ct. at 2348, 57 L.Ed.2d at 209-10. As discussed above in Hess Realty, this court similarly rejected the Director’s apportionment formula where it resulted in revised taxes of 250% of the income portion computed under the Section 6 apportionment formula, and constituted income base tax increases of over 150% for both years at issue.
Applying the principles of these cases to this case, I find that NJNG has not demonstrated the CBT is externally inconsistent. The difference in taxes calculated using the Director’s 100% apportionment coupled with regulatory tax credits and that using the Section 6 apportionment formula is between 4.18% and 15.66% during the years at issue. NJNG has not proven by clear and cogent evidence that this disparity falls outside the constitutional margin of error delineated in decisions of the United States Supreme Court, this court, and other state courts discussed above. I find that Director’s 100% apportionment with regulatory credits given for taxes paid to other states does not create a grossly distorted result as applied to NJNG in this case. Accordingly, I hold that the CBT as applied to NJNG is externally consistent and thus meets the constitutional standards under Co7nplete Auto Transit.
Furthermore, applying the Due Process Clause of the United States Constitution to state tax matters, the United States Supreme Court has stated:
The Due Process Clause places two restrictions on a State’s power to tax income generated by the activities of an interstate business. First, no tax may be imposed unless there is some minimal connection between those activities and the taxing *94 State____Second, the income attributed to the State for tax purposes must be rationally related to “values connected with the taxing State.”
[Moorman, supra, 437 U.S. at 272-73, 98 S.Ct. at 2344, 57 L.Ed.2d at 204 (citations omitted).]
Thus, in order for the CBT to be consistent with Due Process standards, there must be sufficient nexus between NJNG’s business activities and that taxing state (New Jersey), and NJNG’s income attributed to New Jersey for tax purposes must be rationally related to NJNG’s business activities in New Jersey.
During the years at issue, NJNG reported apportionment factors ranging from:
% N.J. Sales Receipts: 78.91% to 98.27%;
% N.J. Property: 77.37% to 95.67; and
% N.J. Payroll: 90.18% to 99.84%.[12]
I find that, based on these apportionment factors, there is sufficient nexus between NJNG’s business activities and New Jersey such that the CBT passes prong one of Due Process analysis.
Second, is there a rational basis for allowing a New Jersey corporation with a regular place of business in another state to be taxed more favorably than a similar corporation without a regular place of business outside of New Jersey? Yes. This ease demonstrates that if a New Jersey based coz’poration has a regular place of business in Connecticut, it would be taxed in Connecticut. Here, Ms. Ryan’s “hozne office” did not constitute a sufficient pz-esence in Connecticut such that NJNG was subject to Connecticut incozne tax. Oz’ganizing one’s business so as to avoid (not evade) taxation in another state is z’ationally related to granting it a moz’e favoz*able New Jez-sey apportionment foz-mula. Accordingly, I find that Directoz-’s 100% apportionment with regulatory cz’edits given for taxes paid to other states is z’ationally related to NJNG’s activities conducted in New Jersey, and therefoz’e, the CBT is constitutional under the Due Pz'ocess Clause.
*95 In sum, I conclude that the appropriate business apportionment factor under the laws and regulations of New Jersey in this case is a 100% apportionment with credits given for taxes paid to other states. NJNG is not entitled to allocate income away from New Jersey under Section 6 because it did not maintain the Connecticut home office as a regular place of business outside of New Jersey. I note that it structured its activities in Connecticut in such a way that it would not incur liability for Connecticut taxes, although it argues that the maintenance of its office in Connecticut is the justification for its use of the Section 6 apportionment formula. Although the Director’s 100% apportionment formula with a credit for taxes actually paid to other states may not be the most precise or preferred formula, NJNG has failed to prove that the Director’s apportionment works a degree of unfairness that requires the application of Section 6 under authority of Section 8, or that otherwise rises to constitutional dimension. Therefore, NJNG’s motion for summary judgment is denied and the Director’s cross-motion for summary judgment is granted. Judgments will be entered accordingly.
VII.
End Note
Almost twenty years ago in Hess Realty this court struggled to harmonize New Jersey’s CBT and accompanying regulations, regarding the apportionment of income of a multistate business, with the Appellate Division’s 2-1 determination in Hoeganaes and modern business practices. Since that time, neither the Legislature, the Director, nor the higher courts have clarified the law and I, like Judge Andrew in Hess Realty, have had to struggle with a different set of facts. See discussion of Hess Realty in Small and Fishbein, The New Right of a New Jersey Based Corporation to Allocate Tricorne to Other States, 8 Journal of State Taxation 81, 84-85 (1989).
Under the CBT, a New Jersey based corpox-ation doing business outside of New Jersey has a right to apportion its income taxable in New Jersey using the Section 6 apportionment formula if it *96 maintains a regular place of business outside of New Jersey. Since NJNG did not maintain a regular place of business outside of New Jersey it is compelled to apportion income under Section 8, which in this case apportions 100% of NJNG’s income to New Jersey and allows for a credit for taxes actually paid to other states.
NJNG comes much closer to meeting the standards of the regulations of a regular place of business and the application of that standard to the facts in Hoeganaes than did the plaintiff in Hess Realty, in which there was no out-of-state employee. In NJNG’s ease, the degree of unfairness in allowing only the credit provisions of the Director’s regulations versus the Section 6 apportionment formula is much less than in Hess Realty. In Hess Realty, supra, the difference between the Section 6 apportionment formula and the crediting provisions of Section 8 and N.J.A.C. 18:7-10.1 was of a magnitude of approximately 250%. 10 N.J.Tax at 89-90. In this case, during the years at issue, that difference is only between 4.18% and 15.66%.[13]
NJNG has not proven by clear and cogent evidence that the disparity in tax assessment between the Director’s 100% apportionment with credits for taxes paid to other states and the Section 6 apportionment formula works a degree of unfairness that rises to constitutional dimension. As such, I find the Director’s method of apportionment satisfies the standards of the Due Process and Commerce Clauses of the United States Constitution as interpreted by Complete Auto Transit.
So that twenty years from now neither taxpayers, the Director, nor the courts need struggle with this issue, I urge the Legislature and the Director to modernize and more clearly state the qualifying facts which will allow a New Jersey corporation doing business outside of New Jersey to allocate a fair portion of its income away from New Jersey. Twenty-first century business practices, see, e.g., Lanco, supra, 379 N.J.Super, at 562, 879 A.2d 1234, may be inconsistent with the requirement for a full-time *97 employee to be in attendance at an out-of-state location and for the current regulatory specification of what that office must look like to determine that a New Jersey based corporation is not doing 100% of its business in New Jersey. Simply passing constitutional muster does not necessarily result in fair, equitable, and modern tax policy.
Plaintiff urges me to follow Hellerdein & Hellerdein’s suggestion that:
The proper resolution of this dilemma [only granting a credit as opposed to allowing a Section G allocation when a New Jersey corporation does not maintain a regular place of business outside of New Jersey] is to repeal the 'regular place of business’ requirement rather than to rely on a strained reading of the equitable apportionment provision to achieve a constitutionally acceptable result.
IHetlerntem & Hellerstein, State Taxation, I Constitutional Limitations and Corporate Income and Franchise Taxes § 8.02(4)(c)(v), 8-34 (3rd ed. 2000).l
NJNG confuses the proper roles of the legal scholar, the courts, and the Legislature. If the Legislature enacts a statute that on its face and as applied to the given facts “achieves a constitutionally acceptable result” the courts will not interfere. If there is to be a change in the statute, that must come from the Legislature. See, e.g., A. No. 1449 (2008) (proposing elimination of the regular place of business requirement). So long as the enacted statute does not exceed what is constitutionally permitted, the courts will enforce the statute as written. Having found that the statutes and regulations as applied to the facts in this case are constitutionally acceptable, the court may not base its determination on the fact that the plaintiff or a recognized expert might think that another statute or regulation is preferred. Having determined that the statute as applied to NJNG is constitutional, its apportionment formula will be 100% less the credits for taxes paid to other jurisdictions.

 Pursuant to the Electric Discount and Energy Competition Act, NJ.S.A. 48:3-49, et seq.

 Specifically, Ms. Ryan was responsible for the following employment duties: coordinating the implementation of NJNG’s Multi-Option Systems, Inc. ("MOSI") system, which NJNG uses to monitor and manage gas purchases, transportation, and off-system sales; developing operating procedures for the MOSI system; assisting personnel of New Jersey Energy Services, a company offering energy supply and management consulting services, with month-end *67 and year-end accounting services; developing accounting reports; and performing other related functions as required by Ms. Ryan's supervisor. Such related functions included assisting in the preparation of a proposal to license NJNG's gas management system to Yankee Gas Company, assisting third-party vendors in designing and implementing ZaiNet, a risk management software program, supervising two of NJNG’s employees, and meeting with NJNG’s personnel to discuss and resolve off-system customer billing and internal accounting issues.
Ms. Ryan's scope of work, deadlines for work completion, and related requirements were determined by Ms. Ryan’s supervisor. Ms. Ryan had to report to work at NJNG's office in Wall, New Jersey at least five days per month as scheduled by her supervisor, which counted towards her requirement to work twenty hours during regular business hours. Ms. Ryan's supervisor could require her to report for work at NJNG’s other offices as necessary. Ms. Ryan was required to dedicate hours spent working at her home office solely to employment duties, and had to provide a project tracking list which included her specific work assignments and time spent thereon.

 Any work-relaled injury was required to be reported pursuant to NJNG's policy governing workplace injuries. Ms. Ryan's home office was required to be in an area dedicated for completing work assignments under her employment agreement. Ms. Ryan was required to ensure that her work space was free of non-work materials that could create safety hazards. Ms. Ryan was required to comply with NJNG's code of conduct and safety manual. NJNG could, at its discretion, conduct pre-scheduled periodic inspections of the home office to ensure that safety guidelines were followed.
Ms. Ryan was permitted to hold only telephonic, work-related meetings at the home office. In such meetings, NJNG answered questions from NJNG's off-system customers and vendors regarding disputed invoices. From December 1991, Ms. Ryan was accessible via telephone, fax, and email. The employment agreement was terminable at will by NJNG, and by Ms. Ryan upon thirty days written notice to her supervisor.

 Prior to its amendment in 1982, the CBT was levied on both net income and net worth. L. 1982, c. 55. Net worth is no longer utilized in computing CBT. See Hess Realty, supra, 10 N.J. Tax at 65, n. 1.

 Since July 1, 1996, the sales factor is double weighted. See L. 1995, c. 245, §§ 1-2.

 Comparison of the facts regarding regular place of business in NJNG v. Director to those in Hess Realty and Hoeganaes:
Hess Hoeganaes Realty NJNG
Rent Paid by Taxpayer . No No No
Telephone Paid by Taxpayer (Business re- Yes lated charges) No Yes
Amount of Time Employees Spent in Out- 20%-25% None 50% of-State Office (Non director/officer)
Control of Area, Signs, etc. by Taxpayer None None None
Furniture and Office Equipment Provided Yes * and Paid by Taxpayer No Yes

 Hoeganaes "suppliefd] business equipment, such as a desk, filing cabinets and a typewriter, only if the employeefs] ha[d] none of [their] own, with one exception'—the dictating equipment, which the company require[d] to be uniform for the convenience of its transcribers____” Hoeganaes, supra, 145 N.J.Super, at 359-60, 367 A.2d 1182.

 This does not seem to be possible if Ms. Ryan was employed in Connecticut. However, this is what NJNG reported on its 2000 tax return.

 NJNG calculates the ratio of the total credits given to the total difference in taxes under the two apportionment formulas to yield a disparity in excess of 1,900%. This is a meaningless statistic. What the Due Process and Commerce Clauses of the United States Constitution compel this court to compare is the difference in taxes owed under the two formulas, which ranges between 4.1751% and 15.6559%. See Hess Realty, supra, and cases cited.

 Tables 1, 2, and 3, supra, at 22-23, reflect sales as reported by NJNG on its returns not the throwback to New Jersey of 85% of profits on out of state sales.

 This percentage is computed as follows: $1,053,165,208 (average N.J. property) / $1,207,920,288 (average total property) = 87.2%.

 This percentage is computed as follows: $129,600,000 (average off-system sales) / $741,000,000 (total average revenue) - 17.5%.

 See Table 1, supra, at 22.

 See Tables 1, 2, and 3, supra, at 22-23.